The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Hal HEBERT, Defendant–Appellee.

No. 01SA400.

Supreme Court of Colorado,
En Banc.

May 20, 2002.

A. William Ritter, Jr., District Attorney, 2nd Judicial District, Robert J. Whitley, Chief Deputy District Attorney, Denver, CO, Attorneys for Plaintiff–Appellant.

Springer & Steinberg, PC, Harvey A. Steinberg, Stacey L. Rose, Denver, CO, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

The People challenge suppression orders entered by the Denver District Court in the prosecution of Hal Hebert (Defendant) for first degree murder.[1] The facts of this case do not support the police officers' warrantless entry into Defendant's residence under the emergency aid exception to the Warrant Clause of the Fourth Amendment to the United States Constitution and of article II, section 7 of the Colorado Constitution; however, the redacted affidavits supporting the search warrants[2] are sufficient to sustain a the search pursuant to the first warrant. Accordingly, since we hold that there was probable cause to support the warrant issued on April 12, there was necessarily probable cause to support the October 2 warrant as well.

---

1. This interlocutory appeal is brought pursuant to section 16–12–102(2), 6 C.R.S. (2001) and C.A.R. 4.1.

2. Police submitted an affidavit for a second search warrant on October 2, 2001, which the court issued. The information contained in the second affidavit is identical to the first, except that it also contains information obtained from

finding of probable cause to search the residence. Therefore, we reverse the trial court's order and remand the case for further proceedings consistent with this opinion.

## I.  FACTS AND PROCEDURAL HISTORY

Defendant is charged with the murder of his wife, Carol Hebert, who was found dead in the trunk of her car on April 12, 2001.[3]

The following factual history is based on the trial court's findings of fact.  On April 12, 2001 between 4:30 and 4:45 p.m., the Denver Police Department received a call reporting a suspicious death.  Sergeant Michael Fetrow, a supervisor in the homicide unit, dispatched two detectives to the scene at 1597 Valentia Street.  After arriving at the location, one of the detectives called Fetrow and told him that a body was found in the trunk of a car.

Witnesses at the scene reported that the car, a white Toyota Camry, had been parked on Valentia Street and running "all day long." (R. at v. IV, p. 56.)  Noting a purse inside the car, the witnesses opened the trunk, found a woman's body, and called the police.

Fetrow arrived at the scene, examined the inside of the Camry's trunk, and observed the body of a white female wearing jeans, a blouse, socks, and a single sandal.  He noticed dirt on the buttocks of the jeans and on the back side of the body and trauma or a gunshot wound to the back side of her head.  Fetrow testified that the inside of the car was fairly clean, with no signs of blood or a struggle.  He believed this was unusual, given the large amount of blood on the victim's head.  Fetrow also observed that the victim did not have any defensive wounds.  Accordingly, based on the way she was placed in the trunk, the dragging dirt marks on the buttocks of her pants, the fact that her glasses were on the back of her head, and the absence of large amounts of blood in the car, he concluded that she had been transported from another crime scene.

After running a motor vehicle report, the officers discovered that the car belonged to Carol Hebert at 655 South Monroe Way.  According to motor vehicle records, Carol Hebert was five foot four inches tall, weighed 120 pounds, and had brown hair and brown eyes, a description matching the victim's.

Meanwhile, other officers were sent to 655 South Monroe Way to "keep an eye on the house." (R. at v. IV, p. 57.)  At approximately 5:20 p.m. or 5:30 p.m., four officers established a perimeter around the residence and began surveillance on the home.  Upon arriving at the Hebert residence, Sergeant Kevin Smith, one of the officers who had established the perimeter, was approached by a neighbor, Petey Fletcher.  Fletcher told Smith that Hal and Carol Hebert lived at 655 South Monroe Way. As they were speaking, Fletcher received a call from another neighbor, Charles Anderson.  According to Fletcher, Anderson remarked that "he had seen Hal backing one of the cars into the driveway and garage on the previous evening and thought it was unusual." (R. at v. IV, p. 58.)

Sergeant Smith watched the back of the Hebert residence for approximately thirty minutes and did not notice any signs of broken windows or forced entry.  He did not observe any activity in the home, and at that time did not believe anyone was in the residence.

Technician Eric Knutson, who was positioned to watch the front of the residence, had been surveying the home for about forty-two minutes when he saw a man, who had driven a white sports utility vehicle to the Hebert residence, get out of the vehicle and walk directly to the residence.  Knutson stopped the driver at the front door.  As he did so, another man, later identified as Defendant, walked out of the front door of the house.

Knutson then spoke with John Mason, the driver of the SUV, who told him that he had been watching a breaking story on the news, which identified a car that had been found.  Mason realized that the car matched the description of Carol Hebert's car.  Mason

---

**3.**   Police had not yet positively identified the body at the time of the warrantless entry or at the time the initial search warrant was executed.  However-

er, the victim's body was found in Carol Hebert's car and matched her description.

then called Defendant, asked him if he was watching the news, and told him that the car might be Carol Hebert's car. Mason also reported that Defendant had called him the previous evening and told him that Carol had gone shopping and had not returned. Mason said Defendant sounded upset and troubled.

In the meantime, Sergeant Smith contacted Defendant, asked him if he was Hal (Hebert), and handcuffed him. Defendant was detained outside his home for about fifteen or twenty minutes before Fetrow told officers to transport Defendant to headquarters because "he didn't like to do death notifications in a public street." (R. at v. IV, p. 61.)

Fetrow left the Valentia Street location at about 6:20 p.m., arriving at the Hebert residence approximately twenty to twenty-five minutes later. Defendant had already been transported to headquarters when he arrived.

After arriving on the scene and obtaining the updated investigations information, Fetrow determined that a search of the house was necessary "to see if there were any other victims, injured or dead." (R. at v. IV, p. 62.) However, Fetrow admitted that he knew that there were no reports of commotion at the residence; that Defendant did not look like he had been in an altercation and was not armed; and that Defendant had not attempted to flee the scene. Moreover, police did not yet have a positive identification of the body, and did not know the composition of the Hebert family. Nonetheless, Fetrow concluded that "it was not out of the realm of possibilities" that there would be more victims. (R. at v. IV, p. 62.)

Using flashlights to illuminate the interior of the home, three officers conducted a search of the residence. They did not open any drawers or cabinets. Although the officers did not locate any victims, they discovered very small blood droplets in various areas, including the carport, the sidewalk to the garage, the hardwood floor, and on a pair of men's shoes. The officers did not touch anything, but covered the suspected blood droplets on the patio with plastic.

In the intervening time, Detective Dave Wallis initiated a search warrant application for the white Toyota Camry. While preparing the application, Lieutenant Jon Priest advised Wallis that Officer Tim Blair saw Defendant at a police substation on April 12 at 2:45 a.m. Blair reported that Defendant appeared intoxicated and complained that his wife was missing. Blair also said that Defendant was given information about the missing persons unit. Blair forwarded this information when he learned of the possible homicide.

Detective Wallis also said that Lieutenant Priest told him about his conversation with Defendant's friend, John Mason. According to Priest, Mason said Defendant called him at midnight the evening of April 11 and said that his wife was missing. Mason said that Defendant told him that his wife left to go shopping at the mall at 6 p.m.; that he fell asleep at 8 p.m.; and that when he awoke at midnight she had not returned.

After the interior search of the residence, Fetrow asked Detective Wallis to prepare an affidavit to support a search warrant for the home and Defendant's car. The warrant was issued at 9:28 p.m. on April 12th and executed fifteen to twenty minutes later.

Detective Wallis and other officers entered the residence approximately five times pursuant to this warrant. According to Wallis, the search was complex and involved the retrieval of blood evidence using time consuming procedures. In addition, the retrieval was complicated by earlier apparent attempts to clean the blood spots. Another search warrant for the home was issued on October 2, 2001.

Defendant was arrested and charged with murder in the first degree pursuant to section 18–3–102(1)(a), 6 C.R.S. (2001). Defendant filed several suppression motions, and the trial court granted each of them. The trial court first ruled that the police officers' warrantless entry into the residence was not justified under the emergency exception because there was no showing of an immediate crisis; thus, it held that the entry violated the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution. Accordingly, it redacted the information obtained by the unconstitutional entry and considered whether

the legally obtained information in the affidavit established probable cause. It held that it did not. Finally, the court held that the good-faith exception to the exclusionary rule did not apply because it reasoned that the exception would "apply in a situation where the officers in good faith relied on a warrant that is improperly issued by a magistrate." (R. at v. IV, p. 76.) Here, "[t]he Court would be speculating as to whether police or a magistrate would have issued a warrant based upon the information without the redacted information." (R. at v. IV, p. 76.)

In this interlocutory appeal, the prosecution challenges suppression of (1) observations made by police during the brief warrantless search of the residence; (2) evidence and observations obtained during a search of the home pursuant to a warrant issued on April 12, 2001; and (3) evidence and observations obtained during a search of the home pursuant to a warrant issued on October 2, 2001.

## II. EMERGENCY AID EXCEPTION

We first must analyze whether the police officers' initial warrantless entry into Defendant's residence was justified by the emergency aid exception to the Warrant Clause of the Fourth Amendment to the United States Constitution and of article II, section 7 of the Colorado Constitution.

■ A warrantless search is prima facia unconstitutional unless it is justified by an established exception to the warrant requirement of the Fourth Amendment and of article II, section 7. *People v. Harper*, 902 P.2d 842, 844 (Colo.1995).

■ An emergency threatening the life or safety of another is one such exception. *People v. Amato*, 193 Colo. 57, 60, 562 P.2d 422, 424 (1977). We have sometimes treated this emergency aid exception under the rubric of exigent circumstances, along with the bona fide "hot pursuit" of a fleeing suspect and the risk of immediate destruction of evidence exceptions. *See, e.g., People v. Winpigler*, 8 P.3d 439, 444 (Colo.1999); *People v. Kluhs-*

*man*, 980 P.2d 529, 534 (Colo.1999); *People v. Higbee*, 802 P.2d 1085, 1088 (Colo.1990). In this context, we have said that a claim of an emergency under the exigent circumstances exception requires both the presence of the exigency and probable cause that contraband or evidence of criminal activity is located at a particular place. *Winpigler*, 8 P.3d at 443–44; *Kluhsman*, 980 P.2d at 534; *Higbee* 802 P.2d at 1088.

On other occasions, we have analyzed emergency situations not as part of the exigent circumstances exception but rather as a part of the "emergency doctrine." *Kluhsman*, 980 P.2d at 535 n. 7; *Harper*, 902 P.2d at 845 n. 2; *Amato*, 193 Colo. at 60, 562 P.2d at 424. In this context, we have held that an emergency under the emergency doctrine does not require probable cause. *Kluhsman*, 980 P.2d at 535 n. 7;[4] *Harper*, 902 P.2d at 845 n. 2; *Amato*, 193 Colo. at 60, 562 P.2d at 424.

■ This dual approach is easily explained. In cases which involve a police response to a fire or other similar emergency, it is easy to understand why a police officer is not required to have probable cause to justify a search: police officers typically respond to many kinds of crises without believing that a crime has occurred. A more difficult situation is presented when a police officer is initially at a scene in an investigative capacity and then makes a warrantless entry to aid an individual in need of emergency assistance. Here, a police officer's crime-fighting and investigative role may transform into a duty to assist individuals in need of emergency aid. Thus, it may appear that probable cause is required because the officer originally came upon the scene in his investigative capacity. Indeed, in many such cases police will have probable cause to search. However, this is not necessarily the case, and if an officer's purpose in effecting a warrantless entry even though he was originally on the scene in an investigative capacity—is to render emergency assistance, probable cause that contraband or evidence of criminal activity is located at a particular

4. In *Kluhsman*, we found that the police officers' decision to enter the defendant's home and search for injured people was justified under both the emergency exception of the "exigent circumstances" doctrine and the "emergency doctrine." *Kluhsman*, 980 P.2d at 535, 535 n. 7.

place is not required.[5] Rather, the officer's actions are justified by a duty separate from the investigation of crime. *See* 1 American Bar Association *Standards for Criminal Justice* §§ 1.1–1, 1–2.2 (2d ed. 1986 Supp.) (police have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses," including to "aid individuals who are in danger of physical harm" "assist those who cannot care for themselves," and "provide other services on an emergency basis"); see also 3 Wayne R. Lafave, *Search and Seizure* § 6.6(a), at 389–90 (3d ed. 1996).

■ In fact, both the so-called emergency doctrine and the emergency exigent circumstance exception have their genesis in *People v. Amato*, 193 Colo. 57, 562 P.2d 422 (1977).[6] While the court in *Amato* noted that the emergency doctrine "has been treated as a variant of the exigent circumstances doctrine," *Amato*, 193 Colo. at 60, 562 P.2d at 424, it did not require probable cause when there was "an immediate crisis and the probability that assistance will be helpful" and the officers' "primary purpose in being there was to render assistance and not to search for evidence." *Id.* at 61, 562 P.2d at 424. Thus, while an emergency is an "exigency" in the sense that police must respond to a crisis "requiring immediate aid or action," *Webster's New International Dictionary: Unabridged* 796 (1986), the use of the word "exigent" as a term of art to describe the emergency exception is misleading. An "exigent circumstance" as a term of legal art requires both the presence of the exigency and probable cause to justify a warrantless entry. *Kluhsman*, 980 P.2d at 534; *People v. Jansen*, 713 P.2d 907, 911 (Colo.1986). Thus, defining the emergency aid exception as an "exigent circumstance" is erroneous because a true emergency situation does not require probable cause that contraband or

other evidence of criminal activity is located at a particular place. We therefore make clear that a colorable claim of an emergency threatening the life or safety of another (the emergency aid exception) is an exception to both the warrant requirement and the usual probable cause requirement.

■ However, several important limitations apply when police effect a warrantless entry under the emergency aid exception. Though police need not have probable cause to believe that contraband or other evidence of criminal activity is located at a particular place, to justify a warrantless search under the emergency aid exception, police must have a reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. *See State v. Fisher*, 141 Ariz. 227, 686 P.2d 750, 760–61 (1984), *overruled in part on other grounds by State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998); *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253, 262 (1990); *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976); *Lubenow v. North Dakota State Highway Comm'r*, 438 N.W.2d 528, 533 (N.D.1989); *see also* 3 Lafave, *supra*, § 6.6(a) at 393. In fact, the emergency aid exception does not give police officers carte blanch to make a warrantless entry whenever there is a theoretical possibility that another's life or safety is in danger; rather, there must be a colorable claim that another's life or safety is in danger. We emphasize that the emergency aid exception to the Warrant Clause requires both an immediate crisis and the probability that assistance will be helpful. *People v. Smith*, 40 P.3d 1287, 1290 (Colo.2002); *Amato*, 193 Colo. at 60, 562 P.2d at 424.

■ Moreover, we note that the prosecution has the burden of proving that the intrusion was necessary given the circum-

---

5. However, we stress that to justify a warrantless entry under the hot pursuit and destruction of evidence exigency exceptions, the People must show both probable cause and the existence of the exigency. *Winpigler*, 8 P.3d at 443–44.

6. For example, in *Kluhsman* we noted that "a colorable claim of emergency threatening the life or safety of another" is an "exigent circumstance[ ]" justifying a warrantless search. 980

P.2d at 534. As support for that proposition, we cited *People v. Lewis*, 975 P.2d 160, 168 (Colo. 1999). Recreating the chain of support, one is ultimately led to *Amato* as the foundation for the "colorable claim of an emergency" exception. Likewise, in *Winpigler*, another recent case analyzing a "colorable claim of an emergency" as an exigent circumstance, *Amato* ultimately serves as the support for the exception.

stances of the case. *Smith*, 40 P.3d at 1289; *People v. Wright*, 804 P.2d 866, 869 (Colo. 1991). To determine whether the prosecution has met its burden, a court must examine the totality of the circumstances as they would have appeared to a "prudent and trained police officer" at the time the decision to conduct the warrantless search is made. *Smith*, 40 P.3d at 1290; *People v. Malczewski*, 744 P.2d 62, 66 (Colo.1987). Finally, a search justified by the emergency aid exception is limited by the nature of the emergency, and courts must not condone a general exploratory search. *Smith*, 40 P.3d at 1290; *People v. Harper*, 902 P.2d 842, 845 (Colo.1995).

## III. THE POLICE OFFICERS' WARRANTLESS ENTRY WAS NOT JUSTIFIED BY THE EMERGENCY AID EXCEPTION BECAUSE NO IMMEDIATE CRISIS EXISTED

■ In the framework of a suppression appeal, we defer to a trial court's historical findings of fact, but review de novo the court's application of legal standards to those facts. *Smith*, 40 P.3d at 1290. Our independent review of the record demonstrates that the trial court's factual findings are supported by the record; thus, the question before us is whether those facts constitute an emergency, and our review is de novo.

■ We first analyze whether the situation—as it would have been objectively examined by a prudent and trained police officer presented an immediate crisis justifying the officers' initial warrantless entry into Defendant's home. We find no immediate crisis. Accordingly, we need not analyze whether police assistance would have been helpful.

It is clear that the police officers in this case were not responding to the kind of immediate crisis that would justify a warrantless search. Sergeant Fetrow testified that the possibility that someone was injured or hurt inside the home was within the "realm of possibility." (R. at v. II, p. 37.) However, to justify a warrantless search and its corresponding intrusion into the privacy of one's home, police must have more than theoretical validation for their actions. Though Sergeant Fetrow admitted that

emergencies generally require police to check for victims "as soon as possible, because the longer you wait the more dangerous it is you will lose somebody," (R. at v. II, p. 65), and though officers conducting surveillance were instructed to "keep an eye on the house," the officers were not directed to search for potential victims. In fact, police did not enter the house until an hour to an hour and a half after the discovery of the body by police. This significant lag time indicates that there was no immediate crisis justifying the warrantless entry.

Furthermore, police did not see signs of broken windows or forced entry and did not note any type of commotion at the residence. Indeed, one experienced officer, Sergeant Smith, even testified, "I saw no activity at the house to indicate there would be somebody in the house." (R. at v. II, p. 153.) "Everything appeared normal and secure," Smith said. (R. at v. II, p. 134.) In fact, police officers were advised by neighbors that Defendant and Carol Hebert were the only residents of the home, and police had no information that anyone else lived there or was there. In addition, when Defendant emerged from the house he did not appear to have been in an altercation, did not appear to have blood on his body or clothes, and did not attempt to flee.

This case is quite unlike others where we have ruled that an emergency validated police officers' warrantless entry and cursory search of a residence. For example, in *People v. Thompson*, 770 P.2d 1282 (Colo.1989), police responded to a call of a domestic dispute and upon arriving on the scene observed spent casings in front of the house, broken glass around the door, and blood on the porch and on an occupant's face and clothing. *Id.* at 1285–86. Though the apparent victim of the domestic violence assured police that she was fine, we reasoned that the casings, broken glass, and blood could have led a reasonable police officer to believe that the women's statements were made under duress and that she was seriously injured and other injured persons might be located on the premises. Thus, we found that an emergency justified the warrantless entry and limited search of the defendant's residence. *Id.* at

1286. Here, in contrast, police observed no broken glass, blood, commotion or other signs of an immediate crisis justifying their warrantless entry into Defendant's home.

In addition, though police claim that it was in the "realm of possibilit[ies]," (R. at v. II, p. 37), that injured victims were in Defendant's residence, this claim is unsubstantiated by any concrete facts. Thus, this case is unlike *People v. Kluhsman* where we ruled that the emergency exception justified police officers' entry into the defendant's residence to search for injured persons based on the defendant's blood-streaked appearance and statements that "people had been chasing him all night," that "they were trying to kill him," that "he had killed a couple of his pursuers," and that there were many people in his home that "had engaged in sexual acts and urinated inside the house." *Kluhsman*, 980 P.2d at 532, 535. In contrast, Defendant in this case did not look like he had been in an altercation, did not appear to have blood on his clothes or body, and did not make any statements that would lead the police to believe that others might be hurt inside Defendant's home. Accordingly, we hold that no immediate crisis justified the police officers' warrantless entry into Defendant's residence, and therefore, the information obtained during this entry—including evidence of blood droplets in the house and on the sidewalk to the garage—was unconstitutionally seized.

## IV. PROBABLE CAUSE TO SUPPORT SEARCH WARRANT

It is well-established that police can not use information obtained solely by unconstitutional means to supply probable cause to support a search warrant. *Bartley v. People*, 817 P.2d 1029, 1033 (Colo.1991). Therefore, we must determine whether the legally obtained information in the affidavit is sufficient, independent of the so-called blood evidence, to establish probable cause. *Id.* ("Where an affidavit includes illegally obtained evidence as well as evidence derived from independent and lawful sources, a valid search warrant may issue if the lawfully obtained evidence, considered by itself, establishes probable cause to issue the warrant.")

We note that a magistrate's probable cause determination is typically given "great deference" and is not reviewed de novo. *People v. Gall*, 30 P.3d 145, 150 (Colo. 2001); *People v. Pate*, 878 P.2d 685, 690 (Colo.1994). Rather, the usual question for a reviewing court is whether the issuing magistrate had a "substantial basis" for issuing the search warrant and not whether the reviewing court would have found probable cause in the first instance. *Gall*, 30 P.3d at 150. In the usual case, doubts must be resolved in favor of a magistrate's determination of probable cause because such deference supports the preference for police to seek a judicial determination of probable cause, rather than resorting to warrantless searches in the hope of relying on consent or another exception to the warrant requirement that might develop at the time of the search. *Gall*, 30 P.3d at 150; *Pate*, 878 P.2d at 690.

However, review of a redacted affidavit presents a different situation. As noted, in the typical case, police present an affidavit to a magistrate who makes a probable cause determination based on the facts averred in the affidavit. In the case of a redacted affidavit, in contrast, the magistrate never had the opportunity in the first place to consider the exact mix of facts remaining and now before the court. Accordingly, we hold that de novo review is the proper standard for an appellate court to apply to determine whether a redacted affidavit is sufficient to establish probable cause. *See Feigin v. Digital Interactive Assocs.*, 987 P.2d 876, 880 (Colo.App.1999) ("[R]eview of the determination by a trial court that an affidavit establishes probable cause after erroneous information is redacted, or it is supplemented with exculpatory information, pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), is de novo."); *see also, e.g., United States v. Blount*, 98 F.3d 1489, 1495 (5th Cir.1996), *reh'g granted, rev'd in part on other grounds, United States v. Blount*, 123 F.3d 831 (5th Cir.1997) (en banc) ("In cases involving the use in a warrant affidavit of unconstitutionally obtained information, we first consider the propriety of the antecedent searches and seizures, excise from the warrant affidavit any tainted information, and then review that remaining

de novo to determine the existence vel non of probable cause for issuance of the warrant."); *cf.* *United States v. Elliott,* 893 F.2d 220, 222 (9th Cir.1990) (In most instances a magistrate's finding of probable cause will not be overturned unless clearly erroneous; however, when an affidavit must be redacted because it was supported by false statements, the magistrate's discretion was vitiated by fraud and the question turns on the legal effect of the correct facts, warranting de novo review.); *State v. Buccini,* 167 Ariz. 550, 810 P.2d 178, 183–84 (1991) (same). *But cf. United States v. Grandstaff,* 813 F.2d 1353, 1355 (9th Cir.1987) ("Because the affidavit presented to the magistrate contained such [illegally obtained] information the question becomes whether the affidavit, purged of the illegally obtained information, still affords the magistrate a substantial basis for concluding that a search would uncover evidence of wrongdoing.")

■ The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit the issuance of a search warrant without probable cause supported by oath or affirmation particularly describing the place to be searched or the things to be seized. U.S. Const. amend. IV; Colo. Const., art. II, § 7. "Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched." *People v. Quintana,* 785 P.2d 934, 937 (Colo.1990).

■ The affidavit must supply a "sufficient nexus between criminal activity, the things to be seized, and the place to be searched." *People v. Kazmierski,* 25 P.3d 1207, 1211 (Colo.2001). However, "the link between suspected criminal activity and a specific location to be searched may be established by circumstantial evidence and proper inferences drawn therefrom." *People v. Hakel,* 870 P.2d 1224, 1229 (Colo.1994).

■ A reviewing court must make its determination of probable cause on the basis of information contained within the four corners of the affidavit. *People v. Randolph,* 4 P.3d 477, 481 (Colo.2000). In examining whether probable cause supported a warrant, an affidavit must be interpreted in a "common sense and realistic fashion." *Bartley,* 817 P.2d at 1033. Given the importance of obtaining a search warrant, a search under a warrant may be sustained where one without it may fail. *Illinois v. Gates,* 462 U.S. 213, 237, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[A]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."); *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (strongly supporting the preference to be accorded searches under a warrant, and recognizing that in doubtful or marginal cases a search under a warrant may be sustainable where without one it would fall). Furthermore, even though the facts alleged in an affidavit may be consistent with an innocent explanation, "[a] combination of otherwise lawful circumstances may well lead to a legitimate inference of criminal activity." *People v. Altman,* 960 P.2d 1164, 1171 (Colo.1998); *see also Gates,* 462 U.S. at 243 n. 13, 103 S.Ct. 2317 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to sub silentio impose a drastically more rigorous definition of probable cause than the security of our citizens' demands.")

## V. THE REDACTED AFFIDAVIT SUPPORTS A FINDING OF PROBABLE CAUSE

We now proceed to evaluate whether the redacted affidavit established probable cause to support the search warrant. Because we must restrict our probable cause analysis to the four corners of the affidavit, we begin by omitting from the affidavit the information obtained during the unconstitutional warrantless search of the Hebert residence and outlining the remaining alleged facts. The remaining information follows:

1. Police officers discover an unidentified Caucasian female body in the trunk of a car at 1597 Valentia Street.

2. The victim's head shows indications of trauma to the front and back. It appears to be a blunt force type injury.

3. The victim is wearing one sandal; her eyeglasses are askew on her head; and she has grease or oil on her pants.

4. A motor vehicle report indicates that the vehicle's license plates list to Carol Hebert at 655 South Monroe Way in Denver. Carol Hebert's driver's license description matches that of the victim.

5. Two witnesses saw the car parked and running at the Valentia Street location all day on April 12. They decided to attempt to contact the owner, discovered the body in the trunk, and called police.

6. Officers responded to 655 South Monroe Way. They observed a 1991 Honda four door car with a license plate listing to Carol and Hal Hebert at the residence.

7. Charles Anderson, a neighbor living at 670 South Monroe Way, told police at the South Monroe location that he had seen Defendant backing the white Toyota into the garage of the residence at about 5:00 p.m. on April 11, 2001. Anderson told police that he believed Defendant's actions were unusual because Defendant did not drive the white Toyota. Anderson said that Carol Hebert usually drove that vehicle. He also thought it was unusual for Defendant to back the car into the garage.

8. At about 2:45 a.m. on April 12, Officer Tim Blair observed Defendant talking to Officers Ron Hughes and Tim Scudder. He described Defendant as agitated, ranting about missing people and how his wife was missing. Officer Blair believed the officers speaking to Defendant were concerned enough about his actions to step closer to him in order to protect themselves. The officers gave Defendant information about the missing persons unit and he left.

9. John Mason, Defendant's best friend, spoke with Defendant at midnight on the night of April 11. Defendant asked Mason if he had seen Carol Hebert. Defendant said she had left for the shopping mall at 6 p.m. He fell asleep at 8 p.m. and when he awoke at midnight he discovered she was not home. Mr. Mason told Defendant that he had not seen Carol Hebert. Mason asked Defendant if he had called police and Defendant responded that he had, but that it does no good.

■ Whether the redacted affidavit demonstrates the existence of probable cause presents a close question; however, given the preference accorded to warrants in "doubtful or marginal cases," *Gates*, 462 U.S. at 237, 103 S.Ct. 2317, and because there are sufficient facts remaining in the affidavit to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity was located at 655 South Monroe Way, we hold that sufficient probable cause existed to support the search warrant on April 12, 2001 and October 2, 2001.

We reject Defendant's argument that the affidavit contained no information that a second crime scene existed and that it failed to establish a nexus between the crime and the Hebert residence. Though there is no direct information establishing a connection between the alleged murder and the residence at 655 South Monroe Way, substantial circumstantial information and reasonable, commonsense inferences drawn from that information, establish the requisite nexus.

Police did not randomly connect criminal activity to the Hebert residence; rather they associated concrete, suspicious activity with "practical" and "commonsense conclusions about human behavior," *Gates*, 462 U.S. at 231, 103 S.Ct. 2317, to support the search warrant. In this case, the last place Carol Hebert was seen was at her residence the night before a body matching her description was found in her parked, running car. Moreover, at 5 p.m. on April 11, the night before the body was found, a neighbor observed Defendant backing Carol Hebert's car into the garage. The neighbor told police that it was unusual for Defendant to drive his wife's vehicle and unusual for him to back it into the garage. Later, around midnight on

the evening of April 11, Defendant told Mason, his best friend, that Defendant's wife—who he claimed had gone shopping at 6 p.m. on April 11—was missing. Police also saw Defendant at a police substation, complaining that his wife was missing. Finally, witnesses reported that Carol Hebert's car was parked and running at the Valentia Street location "all day" on April 12. Though no direct evidence ties criminal activity to the Hebert residence, it is rational to infer that the victim's body was taken to the Valentia Street location from the Hebert residence in the trunk of her car sometime between 5 p.m. on April 11 and the morning of April 12. This explanation comports with other key facts from the affidavit: the fact that the victim was wearing only one shoe; that she had oil on the back of her pants; and that her glasses were askew on her head support a reasonable inference that her body had been moved from a different crime location.

Thus the timeline, Defendant's unusual activity, the fact that Carol Hebert was last seen—according to Defendant—at the residence only one hour after Defendant's unusual action, and the victim's physical state within the trunk all support a reasonable inference that criminal activity occurred at the home and supply the necessary nexus linking Defendant's home to criminal activity.

Again, our conclusion that the affidavit demonstrates the existence of probable cause is bolstered by the preference accorded to warrants, *Gates,* 462 U.S. at 237, 103 S.Ct. 2317, and the strong circumstantial evidence that the victim was allegedly murdered at the residence.[7]

## VI. CONCLUSION

In sum, we hold that the police officers' initial warrantless entry into the Hebert residence was not justified by the emergency aid exception to the warrant clause of the Fourth Amendment to the United States Constitution and of article II, section 7 of the Colorado Constitution. After redacting the unconstitutionally obtained information from the affidavit, we also hold that the remaining

information within the four corners of the affidavit was sufficient to establish probable cause to issue the search warrant. Accordingly, we reverse the trial court and remand the case for further proceedings consistent with this opinion.

---

7. Because we conclude that the affidavit was sufficient to establish probable cause, we need not address the People's argument that the trial

court erred by refusing to consider the good-faith exception to the exclusionary rule.