22CA0825 Peo v Amoako-Asiamah 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0825
Jefferson County District Court No. 20CR1019
Honorable Jason D. Carrithers, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Riddick Jones Amoako-Asiamah,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE KUHN
Schutz and Martinez*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant Attorney General and Assistant Solicitor General, Claire V. Collins, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Riddick Jones Amoako-Asiamah, appeals his convictions for intent to manufacture or distribute more than fifty pounds of marijuana, conspiracy to do the same, and cultivation of more than thirty marijuana plants.  Because Amoako-Asiamah did not receive a fair trial, we reverse the judgment and remand for a new trial.  Nevertheless, we address the court's rulings on the motion to suppress and motion to dismiss for a speedy trial violation because they are likely to arise in the same context on remand.

## I.     Background

¶ 2     The evidence the jury heard at trial would have allowed it to find the following facts.  Amoako-Asiamah and his wife, Melina Chacon,[1] rented a home in Jefferson County.  After several people in the neighborhood submitted complaints regarding a constant very strong odor of marijuana emanating from the home, West Metro Drug Task Force (WMDTF) Detective Janie Enriquez began an investigation.  She conducted surveillance on Amoako-Asiamah's

---

[1] Melina Chacon was a codefendant with Amoako-Asiamah, but their cases were severed before trial.  She is not a party to this appeal.

1

home for approximately six months before the WMDTF obtained a warrant and searched the home and his vehicle. The search found approximately 362 marijuana plants, 53 pounds of marijuana product, approximately $47,500 in cash, expenditure lists regarding the marijuana grow, and ledgers detailing business operations and transactions.

¶ 3     The prosecution initially charged Amoako-Asiamah with intent to manufacture or distribute more than fifty pounds of marijuana in violation of section 18-18-406(2)(b)(I), (III)(A), C.R.S. 2024, and cultivation of more than thirty marijuana plants in violation of section 18-18-406(3)(a)(I), (III)(A). It later added charges for conspiracy to manufacture or distribute marijuana in violation of section 18-18-406(2)(b)(I), (III)(A), and harassment in violation of section 18-9-111(1)(c), C.R.S. 2024. The prosecution dismissed the harassment charge during trial.

¶ 4     Over the course of the proceedings, Amoako-Asiamah had three attorneys but eventually elected to proceed pro se. On the day of his trial, Amoako-Asiamah requested counsel, but the trial court found that he had waived his right and denied his request to revoke that waiver. Amoako-Asiamah then decided to remain in his

holding cell instead of participating in the trial. On the second day of trial, he returned to the courtroom and made an unsworn statement to the jury. But aside from that statement, he was absent for the entire trial, and the defendant's table lay empty. The jury convicted him on all submitted charges, and he was sentenced to twelve years in prison, with all counts running concurrently.

## II.    Analysis

¶ 5     Amoako-Asiamah contends that the trial court erred by (1) permitting him to make an unsworn statement to the jury, resulting in a fundamentally unfair trial; (2) denying his motion to suppress evidence obtained from the search of his home; (3) violating his right to a speedy trial; (4) failing to obtain a waiver of his right to be present for trial and violating Crim. P. 43; and (5) denying his day-of-trial request to appoint counsel. We address each of these contentions in turn.

### A.    Amoako-Asiamah Did Not Receive a Fundamentally Fair Trial

¶ 6     Amoako-Asiamah contends that the trial court erred when it allowed him to make a statement to the jury, violating his rights to due process and a fair trial. Viewing the statement within the full

context of his trial, we agree that the result was so prejudicial that it violated his right to a fair trial.

### 1.     Additional Background

¶ 7     The course of this case was difficult, and the trial court managed multiple contentious situations as the case progressed toward trial.  The day of trial arrived after multiple continuances, delays, appearances and withdrawals of counsel, and interlocutory appeals.  On that day, Amoako-Asiamah refused to leave his cell and go to court.  So he was extracted from his cell and arrived for the trial wearing his jail clothes.

¶ 8     The court called the case outside the presence of the prospective jurors, and Amoako-Asiamah immediately asked to be represented by an attorney, specifically the deputy public defender who had appeared at a previous hearing.  He said, "It is my constitutional right to be represented by an attorney.  And I am not waiving my Sixth Amendment right, right to counsel."  Additionally, he asked to be released on a personal recognizance bond and to again waive the speedy trial deadline.  The court found that he had previously waived the right to counsel and that he was making the request for the purpose of delay.

4

¶ 9     Amoako-Asiamah then engaged in an exchange with the court about whether he would change into civilian garb for the trial. Amoako-Asiamah asserted that he was "not here to go to trial or anything." And after another back-and-forth conversation, Amoako-Asiamah stated, "I want you to proceed this trial without me. Please take me back to my cell, as I have — I was trying to do. I am — not without a lawyer, I'm not going to participate in the trial."

¶ 10    The trial court inquired further regarding Amoako-Asiamah's intent to be absent from the trial. Amoako-Asiamah then spoke to "make the record" regarding speedy trial and his right to counsel. He then said, "I don't want to see the jury. I want to go back to my cell." The court found that Amoako-Asiamah made a knowing, intelligent, and voluntary waiver of his right to be present for the trial. And Amoako-Asiamah was then returned to his cell.

¶ 11    After this decision, the court sent a deputy to ask if he wanted to return to trial every hour throughout the trial. On the second day of trial, Amoako-Asiamah decided to return to make a statement to the jury, but after a recess he again went back to his cell. So other than the trial statement — described below —

Amoako-Asiamah was absent from the trial proceedings, without counsel, and the defense table was empty throughout the course of the trial.

### 2. Applicable Law and Standard of Review

¶ 12    "The due process clauses of the United States and Colorado constitutions guarantee every criminal defendant the right to a fair trial." *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000); *see also* U.S. Const. amends. V, XIV; Colo. Const. art. II, §§ 16, 25.  And the right to a trial by jury "comprehends a fair verdict, free from the influence or poison of evidence which should never have been admitted, and the admission of which arouses passions and prejudices which tend to destroy the fairness and impartiality of the jury." *Oaks v. People*, 371 P.2d 443, 447 (Colo. 1962).  We review de novo whether a defendant's due process rights were violated. *People v. Eason*, 2022 COA 54, ¶ 40.

¶ 13    "The order of proof at trial is a matter within the trial court's sound discretion, and courts are given wide latitude in deciding these matters." *People v. Walden*, 224 P.3d 369, 376 (Colo. App. 2009) (citing CRE 611(a)).  However, a court's discretion is always

limited by the requirements of the Colorado and Federal Constitutions. *Id.*

### 3. Amoako-Asiamah's Trial Statement Deprived Him of Due Process

¶ 14     We view the overall fairness of a trial retrospectively and recognize that this is "an advantage which the trial court does not have." *Oaks*, 371 P.2d at 447.  We also recognize the difficult choices these proceedings presented to the trial court and the pains it took to manage the case.

¶ 15     During the middle of the prosecution's case, Amoako-Asiamah requested that the trial court allow him to make a statement to the jury.  The trial court inquired as to what he meant by a statement and explicitly clarified the following:

> THE COURT: Okay.  And so sir, I want . . . to make sure I understand you.  You're intending to -- when I bring the jury in, you want to make a statement to them, not under oath, and not as part of closing, and then you would like to be let out of the courtroom and returned back to your cell voluntarily; . . . am I understanding?
>
> [AMOAKO-ASIAMAH]: Yes.

¶ 16     The court informed Amoako-Asiamah that it believed the action he was requesting would be prejudicial to his case.  But after

7

Amoako-Asiamah persisted in wishing to address the jury, the trial court nevertheless allowed him to make the statement after advising him that doing so would waive his right to remain silent. The court also advised him that it would instruct the jury that his statement was not under oath and that the jury should disregard any portion of the statement that went outside of the evidence presented. The prosecution objected to the idea, noting that the case was "still on the People's [case-in-chief] at [that] moment in time." The trial court noted the objection, and then it permitted Amoako-Asiamah to make his unsworn statement.[2]

¶ 17    It is at this point, in our view, that the trial went off the tracks. Amoako-Asiamah's statement was rambling and incoherent, triggered over thirty objections from the prosecution, and contained numerous instances of Amoako-Asiamah arguing with the

_____

[2] The People argue that Amoako-Asiamah invited any error arising from the trial statement. We are not convinced that this is the correct lens through which to view this issue. Amoako-Asiamah's argument does not turn on the statement in isolation. Instead, we look at the entirety of the trial with the benefit of hindsight. *See Oaks v. People*, 371 P.2d 443, 447 (Colo. 1962). In doing so, we determine that his trial was no longer fundamentally fair and violated his due process rights. While Amoako-Asiamah undoubtedly kindled the flame, we cannot ignore the resulting blaze or conclude that it was entirely a result of his actions.

prosecutor and the court about what topics he was allowed to discuss. It was unclear what, if anything, Amoako-Asiamah was actually allowed to say to the jury. The end result is a garbled record reflecting the trial court's valiant, but ultimately futile, attempts to address the objections, keep Amoako-Asiamah within the bounds of trial procedure, and maintain control over the proceedings. The statement ultimately concluded with the trial court excusing the jury in the midst of an argument between Amoako-Asiamah, the prosecution, and the court about the presentation of evidence.[3]

¶ 18    At this point in the trial, the jurors had seen the following:

- an empty defendant's table during voir dire;

- no opening statement from the defense;

- an empty defendant's table during the entirety of the trial except for the unsworn statement;

- Amoako-Asiamah appearing in jail garb and giving an unsworn, incoherent, rambling statement devoid of

---

[3] We note that Amoako-Asiamah did not argue that he was in fact permitted to testify about the multitude of objected-to topics he sought to raise.

connection to the evidence presented so far, which drew constant objections from the prosecutor that the trial court sustained;

- Amoako-Asiamah yelling, screaming, and arguing with the court and the prosecutor; and

- an empty defendant's table upon the jurors' return to the courtroom.

¶ 19    In effect, the only impression that jurors were left with of Amoako-Asiamah himself was that of him ranting.[4]  The trial court recognized this fact, noting that "[it] would not be surprised if a reasonable juror certainly drew some impressions upon Mr. Amoako[-Asiamah]'s presence here today.  And they're probably not favorable, because he was yelling and screaming."  Further, there is evidence in the record that, after the statement, the jurors were actually confused by the trial's procedures.  When the jury re-entered the courtroom, the trial court received a jury question asking why Amoako-Asiamah did not have a defense attorney.  And while the court correctly answered it, that question demonstrated

---

[4] We note that Amoako-Asiamah's competency to stand trial was not raised in this appeal.

that the impact of Amoako-Asiamah's statement was front and center in the jurors' minds. *See Oaks*, 371 P.2d at 446 ("[N]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required.").

¶ 20    Additionally, the statement was outside the boundaries prescribed for a trial. CRE 611(a) requires that a "court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth." But Amoako-Asiamah's statement could not serve as testimony, as he was not sworn to tell the truth. *See* CRE 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness's conscience and impress on the witness's mind the duty to do so."). Yet it was also not a closing argument because the evidence had not closed, Amoako-Asiamah had not observed any of the evidence and testimony admitted at trial, and the jury had not yet been instructed. *See People v. Rojas*, 181 P.3d 1216, 1223 (Colo. App.

2008) ("Closing argument must be confined to the evidence admitted at trial, the inferences that can reasonably and fairly be drawn from it, and the instructions of law submitted to the jury.").

¶ 21   Further the statement itself could never have been beneficial to Amoako-Asiamah's case.  At best, the jury could not consider it, and at worst, as the trial court correctly predicted, it would prejudice Amoako-Asiamah to the jury.  *See People v. Avila*, 2019 COA 145, ¶ 53 ("A jury's exposure to extraneous information implicates a defendant's due process right to a fair trial."), *overruled on other grounds by Tibbels v. People*, 2022 CO 1.  The end result was that the jury's only exposure to Amoako-Asiamah (or his case) was a highly prejudicial rant with no grounding in the evidence or appropriate trial procedure.  *See Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) (The right to a fair trial "includes the right to have an impartial jury decide the accused's guilt or innocence solely on the basis of the evidence properly introduced at trial.").

¶ 22   We recognize that, by allowing the statement, the trial court was attempting to protect Amoako-Asiamah's right to present his case.  Nonetheless, the attempt failed, and the result was too great

a deviation from the rules of evidence and standard procedure of a criminal trial.  *See* CRE 603; CRE 611(a)(1).  When viewed alongside the other irregularities during the trial — such as the lack of counsel and Amoako-Asiamah's absence from the proceedings — we cannot conclude that Amoako-Asiamah received a fundamentally fair trial, and thus due process.  *See People v. Dahl,* 160 P.3d 301, 304 (Colo. App. 2007) ("Due process is satisfied by 'a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.'" (quoting *Smith v. Phillips,* 455 U.S. 209, 217 (1982))).

¶ 23     Given all of this, we conclude that the appropriate remedy is "to put the train back on the tracks [before] the point [at which] it derailed."  *People v. Chalchi-Sevilla,* 2019 COA 75, ¶ 23.  Thus, we reverse for a new trial.  *See Oaks,* 371 P.2d at 446.

## B.     The Motion to Suppress

¶ 24     We address two of Amoako-Asiamah's remaining contentions as they are likely to arise in the same context on remand.  He first contends that the trial court erred when it denied his motion to

13

suppress evidence obtained from the search of his home because the underlying affidavit lacked probable cause. We disagree.

### 1. Applicable Law and Standard of Review

¶ 25    The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit unreasonable searches and seizures. *People v. Cox*, 2018 CO 88, ¶ 7. "Under both constitutions, 'a search warrant may only be issued upon a showing of probable cause, supported by oath or affirmation, particularly describing the place to be searched and the things to be seized.'" *Id.* (quoting *People v. Kerst*, 181 P.3d 1167, 1171 (Colo. 2008)).

¶ 26    "Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched." *People v. Miller*, 75 P.3d 1108, 1112 (Colo. 2003). "An affidavit is considered 'bare-bones,' and therefore an officer cannot reasonably rely on it, where the affidavit fails to establish a 'minimally sufficient nexus between the illegal activity and the place to be searched.'" *People v. Gutierrez*, 222 P.3d 925,

941 (Colo. 2009) (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004)).

¶ 27    "A magistrate's probable cause determination is generally given 'great deference' and is not subject to de novo review." *Cox*, ¶ 10 (quoting *People v. Hebert*, 46 P.3d 473, 481 (Colo. 2002)). Therefore, our task is to assess whether the magistrate had a "substantial basis" for issuing the search warrant. *Id.* And "[a]ny doubts must be resolved in favor of the magistrate's probable cause determination." *Id.*

¶ 28    When reviewing the denial of a motion to suppress, we defer to the court's factual findings and will not disturb those findings if they are supported by competent evidence in the record. *People v. Brown*, 217 P.3d 1252, 1255 (Colo. 2009). However, we review the trial court's conclusions of law de novo. *Id.*

### 2. The Magistrate Did Not Err in Finding Probable Cause

¶ 29    Amoako-Asiamah argues that the affidavit to support probable cause for the search warrant was so bare bones that it failed to establish a minimally sufficient nexus between the illegal activity and the place to be searched.

15

¶ 30   The affidavit, sworn by Detective Enriquez, detailed her investigation and included the following statements:

- Detective Enriquez and nearby neighbors observed the very strong odor of marijuana emanating from the home.

- Detective Enriquez surveilled the home for six months, from September 2019 to March 2020.

- Detective Enriquez noted a dramatic decrease in the smell of unburned marijuana from October 2019 until late February 2020.

- Detective Enriquez then noted a dramatic increase in the smell of unburned marijuana in March over the course of a week, which was also observed by two other law enforcement officers.

- Based on Detective Enriquez's training and experience, a cyclical decrease in the smell of unburned marijuana over a period of months, followed by a dramatic increase, was indicative of growing and harvesting plants.

- The home had two visible electrical boxes and a modified or aftermarket system, indicating increased electricity usage.

16

- The home had seven cameras, with one pointed directly at the electrical box, indicating a high concern for security.

- Based on Detective Enriquez's training and experience, it was unusual for those who grow the legal amount of twelve plants to have a modified or aftermarket electrical system on the home, as well as such a high concern for security.

¶ 31    None of these statements, in isolation, conclusively demonstrate criminal activity. However, "the totality of the circumstances test for probable cause is an 'all-things-considered approach,' and its 'ultimate touchstone' is reasonableness." *People v. Zuniga*, 2016 CO 52, ¶ 20 (first quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013); and then quoting *Riley v. California*, 573 U.S. 373, 381 (2014)).

¶ 32    Amoako-Asiamah argues that having two electrical boxes and many cameras is wholly innocent and doesn't suggest criminality. That may be true in some circumstances, but our courts have noted that "hydroponic growing equipment and excessive electrical usage can be inherently suspicious activities known to indicate indoor

17

marijuana cultivation." *People v. Altman*, 960 P.2d 1164, 1171 (Colo. 1998). Regardless, "[a] possible innocent explanation or lawful alternative may add a level of ambiguity to a fact's probative value in a probable cause determination, but it does not destroy the fact's usefulness outright and require it to be disregarded." *Zuniga*, ¶ 20.

¶ 33 Multiple law enforcement officers and other individuals corroborated the consistent smell of unburned marijuana, indicating cultivation. And in her affidavit, the detective described the cyclical nature of the unburned marijuana odor, how that cyclical odor indicates cultivation, the aftermarket electrical equipment, and how that additional electrical equipment indicates an impermissible number of plants. Given these circumstances, we conclude that the affidavit was not "bare-bones" and that the magistrate had a substantial basis for issuing the search warrant. *See Cox*, ¶ 10; *see also Kerst*, 181 P.3d at 1172 ("Due consideration should be given to a law enforcement officer's experience and training in determining the significance of the observations set forth in the affidavit.").

¶ 34     Thus, we discern no error in the trial court's denial of Amoako-Asiamah's motion to suppress evidence obtained from the search of his home.

## C.     Speedy Trial

¶ 35     Amoako-Asiamah next contends that the trial court violated his statutory and constitutional rights to a speedy trial.  The People argue that Amoako-Asiamah failed to present any argument or analysis explaining how the trial court abused its discretion by continuing trial or violated his statutory or constitutional rights. We agree with the People.

¶ 36     Amoako-Asiamah first cites the speedy trial statute, section 18-1-405, C.R.S. 2024.  But the sum total of his argument regarding his statutory right is: "The court here granted the State's continuance owing to witness availability issues.  *See* [§ 18-1-405(6)(g)(I)].  The defendant contends that the court abused its discretion when it did so, violating his right to speedy trial, and that the convictions should therefore be vacated."

¶ 37     He next cites *Barker v. Wingo*, 407 U.S. 514, 530 (1972), which contains the factors used to evaluate whether a defendant's

constitutional speedy trial right has been violated.  He argues in support:

> Here, Mr. Amoako-Asiamah was out of custody at the time and the length of the delay was unreasonable.  Second, the reason for the delay — the unavailability of witnesses for the case — constituted an insufficient reason for delay.  Third, Mr. Amoako-Asiamah had asserted his right to a speedy trial.  Fourth, the prejudice to Mr. Amoako-Asiamah was significant as he was out of custody and a prompt resolution of the case very important under the circumstances.  The defendant contends that the court abused its discretion when it did so, violating his right to speedy trial, and that the convictions should therefore be vacated.

¶ 38    In the answer brief, the People point out that these arguments are bare bones and undeveloped.  But Amoako-Asiamah doesn't respond to those arguments in his reply brief or attempt to expand his argument by explaining how the court's actions violated his statutory or constitutional speedy trial rights.  Instead, he lets his arguments stand as bald assertions.

¶ 39    "[W]e will not consider a bald legal proposition presented without argument or development."  *People v. Rios*, 2020 COA 2, ¶ 7 n.1; *see* C.A.R. 28(a)(7)(B); *see also People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003).  And while we don't do so here, we note that

20

"[a]n appellant's failure to respond in the reply brief to an argument made in the answer brief may be taken as a concession." *People v. Bondsteel*, 2015 COA 165, ¶ 61 n.6, *aff'd*, 2019 CO 26, *and overruled on other grounds by Garcia v. People*, 2022 CO 6. Under these circumstances, we decline to review this issue further.

## D. Remaining Contentions

¶ 40    Finally, Amoako-Asiamah contends that the trial court (1) violated his right to be present at trial under the Colorado and Federal Constitutions and Crim. P. 43; and (2) erred by denying his day-of-trial request to appoint an attorney to represent him or, in the alternative, by failing to sua sponte appoint him advisory counsel. We conclude that these contentions of error are unlikely to arise in the same context on remand. We therefore decline to address them. *See People v. Newton*, 2022 COA 59, ¶ 7 n.1.

## III. Disposition

¶ 41    Thus, we perceive no error in the trial court's rulings on the motion to suppress and the motion to dismiss for a speedy trial violation. *See Super Valu Stores, Inc. v. Dist. Ct.*, 906 P.2d 72, 79 (Colo. 1995) ("Conclusions of an appellate court on issues presented

to it as well as rulings logically necessary to sustain such conclusions become the law of the case.").

¶ 42    The judgment of conviction is reversed, and the case is remanded for a new trial.

JUDGE SCHUTZ and JUSTICE MARTINEZ concur.