The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Benjamin Otto PATE, Defendant–Appellee.

No. 03SA37.

Supreme Court of Colorado, En Banc.

June 30, 2003.

Jeanne M. Smith, District Attorney, Fourth Judicial District, Gordon R. Denison, Deputy District Attorney, Jeanne M. Wilson, Deputy District Attorney, Diana May, Deputy District Attorney, Colorado Springs, Colorado, Attorneys for Plaintiff-Appellant.

David S. Kaplan, Colorado State Public Defender, William A. Martinez, Deputy State Public Defender, Cynthia J. Jones, Deputy State Public Defender, Colorado Springs, Colorado, Attorneys for Defendant-Appellee.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this interlocutory appeal, we uphold the trial court's historical findings of facts, substantiated by the record, which support its conclusions of law that the police in this case lacked probable cause to believe that a burglary was in progress and that the police lacked a reasonable basis to believe that there was a colorable claim of an emergency threatening the life or safety of another in the defendant's home. Accordingly, we hold that the police's warrantless entry into the defendant's home was justified by neither the exigent circumstances exception nor the emergency aid exception and violated his constitutional right to be free from unreasonable searches. Thus, we affirm the trial court's suppression order and remand the case for further proceedings consistent with this opinion.

## II. Facts and Proceedings Below

Based on the testimony of Officers Good and Zortman, the only witnesses testifying at two suppression hearings, the pertinent facts are as follows.

Colorado Springs Officers Good and Zortman responded to an early morning 911 call about a burglary in progress. The caller reported a "lot of racket" and could see possibly four suspects.

The officers went to the specified address and searched the area. After an extensive walk through, the officers found no evidence of a burglary. The officers were about to leave when they encountered two people in a car. The passengers in the car directed the officers to a group of nearby apartments, not the original burglary call address, where

they had heard someone shout "Let her go" and the sound of breaking glass. The first passenger saw two individuals running from the area while the other passenger saw four individuals running.

After speaking with the two people in the car and approximately twenty minutes after the initial dispatch call, Officer Good walked toward the apartments. Upon approaching the apartments, he saw a man walking towards him from the back of the apartment building. Although the man, whom the officers later identified as William Wonza, had blood on his head and face, Officer Good did not believe that Wonza had a serious injury or required immediate attention. Wonza was fully aware and cooperative with the officers. There was a brief exchange between Officer Good and Wonza, during which time Officer Zortman joined them.

At the two suppression hearings, the testimony of Officers Good and Zortman differed as to what Wonza said during the brief exchange. During the first hearing, Officer Good testified on direct that he asked Wonza where he had come from and Wonza indicated an apartment and said only that his friend "Ben was inside." Consistent with this statement, Officer Good said that after speaking with all of the witnesses, including Wonza, he still did not have any idea about what was going on:

> [W]e weren't exactly sure what we had at that point. According to the witnesses, we weren't even sure if they made entry into the apartment, whether we actually had a burglary. I mean, we didn't know what we had, so everyone is a suspect until we find out otherwise, till we clear them all, and then we start figuring out exactly what's going on.

But upon cross-examination, Officer Good modified his testimony and stated that Wonza told him that "Ben was *injured* inside" and thus Officer Good became concerned about Ben's welfare after talking with Wonza. During the second hearing, Officer Good repeated that after speaking with Wonza, he still had "no clue what was going on, so we kind of wanted to gather everyone first, then start asking questions."

In her testimony, Officer Zortman stated that she did not hear Wonza say a person was injured inside the apartment. Consequently, her official report of events fails to state that Wonza indicated that someone was injured inside the apartment.

During the exchange with Wonza, neither Officer Good nor Zortman asked him who resided in the apartment, whether they had permission to enter the apartment, about the extent of anyone's injuries, if anyone required medical assistance, who or what had caused any of the injuries, whether the injuries had occurred in the apartment, or whether there was any illegal activity occurring in the apartment.

Despite lacking any understanding of what had happened, Officers Good and Zortman left Wonza with another officer without any further questions or assistance, and walked towards the apartment to investigate with two other officers who had arrived at the scene.

Upon arriving at the backyard deck of the apartment building, the officers noticed broken window glass. They saw no other signs of a disturbance or a burglary. The officers did not hear any noises coming from the building nor did they have any other indication of violence. Upon reaching the apartment door, however, the four officers drew their guns and without knocking or otherwise asking permission to enter, moved into the defendant's home and down a stairwell toward the defendant's living space.

The defendant, Benjamin Pate, was standing at the bottom of the stairs. He was injured and bleeding, but calm and cooperative. Officer Good pointed his gun at Pate and asked him to show him his hands and whether there were any other people in the apartment. Pate complied and said there were no other people in the apartment.

The three officers detained Pate while Officer Good conducted a quick search. Finding no one else, Officer Good returned to Pate and asked him if he was carrying any drugs or weapons. Pate said yes, stating that he had ketamine and marijuana in his possession. Officer Good patted him down and discovered thirty-six bags of ketamine, a

Schedule III controlled substance, and less than an ounce of marijuana in Pate's pockets. While in the apartment, Officer Good did not ask about Pate's injuries, whether he required medical assistance, whether he had been the victim of a crime or whether any crime had occurred in the apartment.

The officers removed Pate from the apartment and took him outside to question him further. For the first time, the officers asked both Pate and Wonza what had happened. They told the officers that they were victims of assault and robbery. Both Pate and Wonza required medical attention and were taken to the hospital.

Upon the conclusion of the officers' testimony during the first suppression hearing, the trial court ruled that there was no justification whatsoever for the police officers' warrantless entry into Pate's residence. The trial court found that there was no evidence that the police knocked, that they did not get a response, or that they needed to make a warrantless entry to determine Pate's well-being. The trial court found that the only evidence available to the police that was reliable was the statement from Wonza that his friend was still in the apartment. The trial court concluded that not only did the police lack probable cause to enter Pate's apartment, there was not even a reasonable and articulable suspicion that criminal activity had occurred in Pate's apartment that would justify their intrusion. Thus, the trial court suppressed all evidence and statements secured by the police during their illegal search of Pate's residence.

On its own motion, the court held a second suppression hearing with additional testimony from the two officers but similarly concluded that the police entered Pate's apartment in violation of his constitutional rights.

First, the trial court found that the officers did not have probable cause to support any of the traditional exigent circumstances exceptions that would justify a warrantless entry. The police were not involved in hot pursuit and they did not have probable cause to believe that a crime had occurred in the apartment or that evidence would be lost if they did not take immediate action. The trial court found that all of the officers testified repeatedly that they had no idea what was going on and were simply trying to conduct an investigation to make a determination. The trial court concluded that any of the warrantless exceptions based upon probable cause clearly failed for the absence of any probable cause whatsoever.

Second, the trial court ruled that there was no evidence that the officers had a reasonable basis to believe that there was an immediate crisis or emergency in the apartment with respect to Pate's well-being that required police assistance to justify their illegal intrusion. The trial court found that the officers had an opportunity to question Wonza, who had just come from Pate's apartment, about whose apartment it was, who was in the apartment, and the extent of the injuries allegedly suffered by Pate. The officers failed to ask any such questions.

The court further found that the first time Officer Good testified, he made no mention of his primary reason in going into the apartment to check on the well-being of Pate. Except when prompted by counsel, at no time did Officer Good state that the officers' primary purpose was to ascertain the well-being of Pate.

The trial court found that the officers might have been able to determine Pate's well-being if they had knocked on his door first and questioned Pate before entering his home. Indeed, the trial court determined that the officers' conduct—entering the apartment guns drawn and without knocking first—was exceedingly dangerous for the officers and Pate.

The trial court further found that the officers' conduct once they were inside the apartment likewise showed a lack of primary concern for Pate's well-being. There was no testimony that the police officers asked Pate if he was injured, whether they needed to provide medical assistance to him, whether he was, in fact, a victim of a crime, or whether he had been assaulted during the commission of a crime. Instead, Pate was treated as a suspect throughout the entire encounter. The court concluded that there was no evidence presented that would indicate that the police entered the apartment to provide as-

sistance to Pate. Thus, the trial court affirmed its earlier order and suppressed all evidence obtained during the illegal search.

Pursuant to C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (2002), the People filed this interlocutory appeal of the trial court's suppression order.

### III. Exceptions to Otherwise Unreasonable and Unconstitutional Warrantless Searches: Exigent Circumstances and Emergency Aid

■ When ruling on a motion to suppress, a trial court must engage both in factfinding—a specific inquiry into the historical phenomena of the case—and law application, which involves the application of the controlling legal standard to the facts established by the evidence. *People v. King*, 16 P.3d 807, 812 (Colo.2001)(internal citations omitted). The trial court's findings of historical facts are entitled to deference and will not be overturned if supported by competent evidence in the record. *See People v. Rivas*, 13 P.3d 315, 320 (Colo.2000).

■ The role of the appellate court, however, is to determine whether the trial court's legal conclusions are supported by sufficient evidence and whether the trial court applied the correct legal standards. When no controlling facts are in dispute, the appellate court may review the issue *de novo* because the legal effect of undisputed controlling facts is a question of law. *Id.* Because we find that no controlling facts are in dispute here, we turn to a discussion of the legal standards.

■ Both the United States and Colorado Constitutions bar unreasonable searches and seizures. *See* U.S. Const. amend. IV; Colo. Const. art. II, § 7. We have held that a warrantless search and seizure is presumptively unreasonable unless justified by one of the well-established exceptions to the Warrant Clause of the Fourth Amendment. *See People v. Hebert*, 46 P.3d 473, 478 (Colo. 2002). The burden is on the prosecution to prove one of these exceptions. *See People v. Amato*, 193 Colo. 57, 60, 562 P.2d 422, 423 (1977). To determine whether the prosecution has met its burden, courts must examine the totality of the circumstances as they would have appeared to "a prudent and trained police officer" at the time the decision to conduct a warrantless entry was made. *Hebert*, 46 P.3d at 480; *People v. Grazier*, 992 P.2d 1149, 1154 (Colo.2000).

■ One such exception to the Warrant Clause applies when exigent circumstances exist that necessitate immediate police action. *People v. Kluhsman*, 980 P.2d 529, 534 (Colo.1999). Under the exigent circumstances exception, the prosecution must prove (1) the presence of probable cause and (2) an exigent circumstance that justifies a warrantless entry. *Id.* We have held that three situations qualify as "exigent circumstances" that would justify such an unauthorized entry: (1) when police are engaged in "hot pursuit" of a fleeing suspect; (2) there is a risk of immediate destruction of evidence; or (3) there is a colorable claim of an emergency situation threatening the life or safety of another. *Id.*

■ The emergency situation has been invoked in burglary cases when police officers make a warrantless entry into a residence to secure the premises and search for suspects and victims. *See, e.g., People v. Unruh*, 713 P.2d 370, 379 (Colo.1986). However, to justify a warrantless entry, police must have probable cause to believe that a burglary recently occurred or may be in progress. *Grazier*, 992 P.2d at 1154.

In *Grazier*, for example, we upheld the trial court's suppression order in a burglary case because the police lacked probable cause to enter a residence without a warrant under the exigent circumstances exception. *Id.* at 1156. In that case, the police received a 911 call about a possible burglary in progress. The caller reported observing men enter an apartment through a window, open the door to let another man into the apartment, and then close the curtains. The caller, a neighbor to the apartment, did not think that any of the men lived at the apartment. *Id.* at 1151.

When the police investigated the apartment, however, they did not observe any signs of a burglary in progress. There was no forced entry. They did not hear any noises or see any other suspicious movement. Through the window they saw a man inside

but he was not armed and posed no apparent threat. The officers knocked on the door and the man answered. Without questioning him about whether he lived there or his identify or the reason for his presence, the officers handcuffed him and entered the apartment. *Id.* at 1152, 1155.

On such facts, we held that the trial court correctly ruled that the police officers' observations did not establish probable cause to believe that there was a burglary in progress. *Id.* at 1155–56. Suspicion alone does not rise to the level of probable cause. *Id.* at 1154. The police officers failed to act reasonably under the circumstances and thus could not invoke the exigent circumstances exception to justify their unconstitutional entry.

 A second established exception to the Warrant Clause is the emergency aid exception. The emergency aid exception also requires a "colorable claim of an emergency threatening the life or safety of another." *Hebert,* 46 P.3d at 479. However, unlike the exigent circumstances exception, the emergency aid exception requires the prosecution to prove the existence of "an immediate crisis and the probability that [police] assistance will be helpful." *Amato,* 193 Colo. at 60, 562 P.2d at 424. Also, the emergency aid doctrine does not require probable cause. *Id.; see also Kluhsman,* 980 P.2d at 535 n. 7.

The factual contexts in which we have applied the emergency aid exception explain the absence of the usual probable cause requirement for warrantless searches. For example, when police respond to a fire or other similar emergency, it is easy to understand why they are not required to have probable cause. *See Hebert,* 46 P.3d at 478.

 The more difficult situation arises when police officers are originally investigating a scene but then make a warrantless entry to aid an individual in need of emergency assistance. *Id.* If the officer's purpose in entering a place without a warrant is to render emergency assistance, then police need not have probable cause to believe that contraband or other evidence of criminal activity is located at a particular place. *Id.*

 Although no usual probable cause is required under the emergency aid exception, police must have a reasonable basis approximating probable cause to associate the emergency with the area or place to be searched. *Id.* at 479. As we have explained in the past, the "reasonable basis" allows police to make warrantless entries only when there are facts to support the conclusion that someone's life or safety is seriously threatened:

> [T]he emergency aid exception does not give police officers carte blanche to make a warrantless entry whenever there is a theoretical possibility that another's life or safety is in danger; rather, there must be a colorable claim that another's life or safety is in danger.

*Id.* We applied the reasonable basis test in *People v. Thompson,* 770 P.2d 1282 (Colo. 1989), where we upheld the police officers' warrantless entry because there was a colorable claim that someone's life or safety was in danger.

In *Thompson,* the police responded to a 911 domestic violence call. 770 P.2d at 1284–85. When they arrived at the scene, the officers observed several spent bullet casings on the driveway, blood on the front porch, the front door, and on the side of the house next to the front door, a front door ajar several inches, and shattered glass. Observing these signs of violence, the police knocked on the door. A woman answered who had blood covering her face and clothes and was holding an ice pack to her head. *Id.* We concluded that the police's subsequent entry into the residence, without a warrant and without the woman's permission, was necessary and authorized under the emergency aid exception given the signs that suggested the woman's safety was in danger. *Id.* at 1286.

Having discussed two exceptions that would justify a warrantless entry into a person's home, we turn to an application of these exceptions to the facts of this case as found by the trial court.

## IV. The Police Officers' Warrantless Entry into Pate's Home Was Not Justified By Either the Exigent Circumstances Exception or the Emergency Aid Exception to the Warrant Clauses to the U.S. and Colorado Constitutions

The People argue that both the exigent circumstances and the emergency aid excep-

tions exist here to justify the police officers' warrantless entry into Pate's home.

First, the People argue that they have shown that there was probable cause for the officers to believe that a burglary had just taken place or was currently taking place in Pate's apartment so as to invoke the exigent circumstances exception. In support of their argument, the People state that the officers received a 911 call about a burglary in progress and witnesses on the scene reported hearing suspicious noises (a loud commotion and a woman screaming) and seeing men run from the area. In addition, the police talked with an injured man who said his friend remained inside an apartment, possibly injured, and saw broken glass at the entrance to the same apartment.

Second, the People argue that even if the officers did not have probable cause to invoke the exigent circumstances exception, the police officers' testimony proves that the warrantless entry into Pate's residence was justified under the emergency aid exception because the police had a reasonable basis to believe that an immediate crisis existed and there was a probability that their assistance would be useful. The witnesses told the police that they heard shouting, a woman screaming, the sound of breaking glass, and saw two or four men running from the scene. The officers encountered an injured man who said that his friend was inside, also possibly injured, and observed a broken apartment window. The People conclude that the officers' testimony clearly shows that the officers entered the apartment to render emergency aid.

We disagree. We must defer to the factual findings of the trial court and thus conclude that based on those facts, neither exception applies. Under the totality of the circumstances as they would have appeared to a prudent and trained police officer at the time, we agree with the trial court that the police officers' warrantless entry into Pate's home violated his constitutional right to be free from an unreasonable search and seizure.

## A. Exigent Circumstances

 The People failed to prove that the police officers had probable cause to believe that an exigent circumstance existed that would justify their warrantless search. Unquestionably, as found by the trial court, exigent circumstances such as the "hot pursuit" of a fleeing suspect or the risk of immediate destruction of evidence were not present here. Thus, the People must show that the police officers had probable cause to believe that there was an emergency situation—such as a burglary in progress—that would justify a warrantless search to secure the premises and search for suspects and victims.

The People have failed to prove such an emergency situation. Although the officers might have been suspicious that a burglary had occurred, such suspicion did not rise to the level of probable cause. *Grazier*, 992 P.2d at 1154. On the contrary, the officers' own testimony regarding their observations of Pate's apartment and their encounter with the key witness, Wonza, show not only that they did not have probable cause to believe a burglary occurred, but they did not have probable cause to believe that any illegal activity had occurred in Pate's apartment.

At the apartment, the officers testified that, with the exception of the broken window glass, there was no other indication of a burglary in progress or any other disturbance. They did not hear any noises. They did not see any other signs of a forced entry. They did not see any other signs of violence or suspicious movement. *Id.* at 1152, 1155; *cf. People v. Berow*, 688 P.2d 1123, 1125–26 (Colo.1984)(holding that officers could have reasonably believed that a burglary was in progress based on evidence showing that the apartment owner was out of town, the locks of the apartment door had been forcibly removed, and a witness saw suspicious movement inside the apartment).

Despite the lack of observable evidence that a burglary had occurred at Pate's apartment, the police failed to question the key witness who might have provided them with probable cause to enter the apartment without a warrant to secure the premises and search for victims and suspects. The police

did not ask Wonza any questions critical to a burglary investigation. They did not ask him who lived in the apartment, whether a burglary had occurred, if Wonza's or Pate's injuries were related to a burglary or other criminal activity, whether Wonza or Pate were victims or perpetrators of a burglary, or whether any other victims or perpetrators were still inside. Cf. Kluhsman, 980 P.2d at 535 (holding that exigent circumstances justified officers' warrantless entry into defendant's home after defendant told them that he had just killed someone and people remained inside his home).

Indeed, the police testified repeatedly that after speaking with Wonza, they did not know what type of situation they faced. They did not know whether there had been an entry into Pate's apartment or whether it had been burglarized. The stated purpose of the officers' warrantless entry was not to secure the home because they believed a burglary might be in progress but rather to "gather everyone first and then figure out what had happened." Thus, the police entered the apartment guns drawn, without knocking and without inquiring first from the people outside or inside what might have happened.

On such facts, we hold that the trial court correctly ruled that the police officers' observations in this case did not establish probable cause to believe that there was a burglary in progress in Pate's home. Grazier, 992 P.2d at 1155–56. Thus, the police officers failed to act reasonably under the totality of the circumstances and cannot invoke the exigent circumstances exception to justify their unconstitutional entry.

## B. Emergency Aid

■ We also conclude, as did the trial court, that the People failed to prove that an immediate crisis existed and that the probability that police assistance would be helpful, either of which would be sufficient to invoke the emergency aid exception. Although the police are not required to have probable cause under this exception, they must have a "reasonable basis approximating probable cause" to associate the emergency with the area or place to be searched. Hebert, 46

P.3d at 479. No such reasonable basis existed·here.

First, there was no evidence of an "immediate crisis" in Pate's home. The police responded to a call about a burglary in progress at an address that was not Pate's address. The call did not include any report of violence or any other situation that might suggest an armed or dangerous perpetrator. Cf. Thompson, 770 P.2d at 1284 (domestic violence call); People v. Mascarenas, 972 P.2d 717, 719 (Colo.App. 1998)(same). After responding to the area, the police found no observable evidence of a burglary or any other criminal activity at the original address. It was not until twenty minutes after the dispatch call that they encountered the injured Wonza coming from a different apartment. See Hebert, 46 P.3d at 480 (holding that "significant lag time" indicates that there was no immediate crisis justifying warrantless entry).

When the police encountered Wonza, the trial court found that the only reliable information they had was that Wonza was bleeding and that he had come from the nearby apartment where someone named "Ben" remained inside. The officers testified that they did not know anything about what had occurred to Wonza or the person who remained in the apartment. Before entering the apartment, the officers did not ask about the extent of anyone's injuries, whether anyone required medical attention, or whether the injuries actually occurred in the apartment. The officers also did not seek or receive any information that any illegal activity was ongoing or that any suspects, dangerous or otherwise, remained in the apartment. The officers here had no reliable or credible evidence that connected an immediate crisis or an emergency threatening someone's life or safety with Pate's specific apartment. Cf. Thompson, 770 P.2d at 1284, 1286 (holding that the police could invoke the emergency aid exception to enter a house without a warrant when the officers observed several spent bullet casings in the driveway; blood all over the outside of the house; the front door ajar several inches; shattered glass in the front door; and the woman answering the door after the police knocked had blood

on her face and held an ice pack to her head). Although it remained in the "realm of possibilities" that an injured victim was in Pate's residence, this claim, as found by the trial court, was unsubstantiated by any reliable facts. *See Hebert,* 46 P.3d at 481. Thus, the officers in this case had no reasonable basis approximating probable cause to believe that an immediate crisis or emergency existed to justify their entry into Pate's home without a warrant or without seeking his permission to do so.

Even if we were to hold that the officers had a reasonable basis to believe that someone's life or safety was in danger in Pate's home, there exists no evidence to show that the officers entered the home to provide emergency assistance consistent with that belief. The officers made no attempt to knock on the door to obtain permission to enter and determine if anyone actually needed emergency assistance.

As the trial court found under the circumstances of this case, the officers' entry into the apartment—guns drawn, without knocking first, and without any information about Pate's well-being or what was occurring inside—was exceedingly dangerous to all involved. Indeed, had the officers knocked first and questioned Pate before entering his apartment, they may have obtained his consent to enter or information to provide them with a reasonable basis to believe an emergency situation existed that would allow them to enter his residence to provide assistance without such consent or a warrant. *See, e.g., Thompson,* 770 P.2d at 1284; *Mascarenas,* 972 P.2d at 720.

Instead, without any information as to Pate's well-being or what was occurring inside, the officers went into the apartment and pointed guns at the injured and bleeding Pate who had just been assaulted and robbed. At no time inside the apartment did the officers inquire about Pate's injuries, whether he required medical assistance, or whether he had been the victim of a crime. After searching the apartment, the first question that the officers asked Pate was not whether he required their assistance, but whether he had drugs or weapons.

Indeed, as supported by the officers' testimony and found by the trial court, the purpose of the officers' warrantless entry into Pate's home was not to provide emergency assistance, but rather to investigate. During his direct examination, Officer Good never stated that the officers entered the apartment with the intent to render medical aid to the injured occupant. Officer Good only mentioned the topic of emergency assistance during cross-examination. Instead, Officer Good testified repeatedly that they were "trying to figure out what was going on," a task that is more consistent with the officers' duties as investigators. Because the trial court found as a fact that the officers entered Pate's home to investigate, and not because they reasonably believed that someone's life or safety was in danger, they were not authorized to enter without a warrant under the emergency aid exception. *Hebert,* 46 P.3d at 479.

In sum, the trial court's findings of historical fact in this case are amply supported by the record and thus must be given deference. Under our *de novo* review, we conclude that such facts support the trial court's legal conclusion that neither the exigent circumstances exception nor the emergency aid exception authorized the police officers to enter Pate's home without a warrant. Thus, we hold that the police officers' conduct in this case violated Pate's constitutional right to be free from unreasonable searches and any evidence obtained as a result of such a search must be suppressed.

## V. Conclusion

For the reasons stated above, we affirm the trial court's suppression order and remand this case back to that court for further proceedings consistent with this opinion.

Justice COATS dissents, and Justice KOURLIS and Justice RICE join in the dissent.

Justice COATS, dissenting:

In affirming the suppression of drugs and incriminating statements in this case, the majority finds that the police acted improperly and violated the defendant's constitutional

rights, not by arresting, searching, or questioning him in an unlawful manner, but by stepping into the stairway to his apartment without a warrant, through an unlocked and perhaps unclosed door. According to the uncontested testimony at the suppression hearing, they did so at about 3:00 in the morning, some 20 minutes after receiving (and while actively and continuously investigating) a report of a possible burglary in progress; only after learning from neighbors that a woman screamed, someone shouted, "Let her go," glass was broken, and several men fled from the area of a deck behind the apartment building; and only after then encountering a man coming from the back of the building, where the apartment door was located, who was bleeding from the head or face, and who pointed out the specific apartment from which he had just come and indicated that another man was still inside.

The majority holds that under these circumstances the police lacked probable cause, lacked exigent circumstances to excuse a warrant, and lacked reasonable grounds to believe that someone inside might need immediate police assistance. Because I believe all three of these conclusions are inconsistent with established principles of Fourth Amendment jurisprudence and will deleteriously affect the ability of police to protect the public in this jurisdiction, I respectfully dissent.

Initially, the majority notes at several different points the obligation of reviewing courts to defer to findings of historical fact by trial courts. While that proposition is certainly true, I do not believe the district court in this case resolved any disputed questions of fact or rejected any testimony as incredible. Even with regard to the officers' belief that the man inside the apartment was injured, upon which the majority dwells at some length, *see* maj. op. at 1008–1009, the district court's ruling neither questioned the credibility of Officer Good nor found that he was not, in fact, told as much by the bloodied man leaving the scene. The district court

merely inferred from all the testimony that the officers' concern for the defendant's welfare was not their primary concern.[1] The critical determinations of the district court, with which the majority agrees, are all questions of law, or at least mixed questions of fact and law, to be resolved independently by this court. *See People v. Rivas,* 13 P.3d 315, 320 (Colo.2000) (controlling facts that are undisputed and not specifically included in findings of fact are treated as matters of law).

In my view, the majority's analysis confounds and conflates the question of probable cause to support an arrest or search with the presence of exigencies sufficient to permit the entry of premises without a warrant, or perhaps without even probable cause of a crime. The majority analysis notwithstanding, "hot pursuit," in the sense of eyeball contact with a fleeing suspect, is clearly not the only circumstance permitting the warrantless entry of premises in search of a suspected perpetrator, and burglary is clearly not the only crime the interruption or immediate investigation of which could justify a warrantless entry of premises. *See, e.g., Wike v. State,* 596 So.2d 1020 (Fla.1992) (immediate investigation of reported murder); *State v. Hardin,* 359 N.W.2d 185 (Iowa 1984) (rape at premises immediately reported to police shortly before entry); *State v. Welch,* 449 So.2d 468 (La.1984) (complaint of sexual assault on premises twenty minutes earlier); *Jones v. State,* 565 S.W.2d 934 (Tex.Crim. App.1978) (several hours after robbery and arrest of several robbers in vicinity). Probable cause of any number of ongoing or recently committed crimes, like assault, sexual assault, robbery, or kidnapping, acquired in any number of ways, could necessitate an immediate entry, not only to stop the crime and apprehend the perpetrators, but also to assist the victims, whether or not the police also had reason to suspect an unlawful breaking and entering. While the exigencies that may justify a warrantless entry to apprehend

---

1. Even on cross-examination at the first hearing, Officer Good did not initially recall being told that the man inside was injured. He made no attempt to modify his testimony to support any assertion of an emergency situation; he merely conceded, when confronted with Officer Garza's report *by defense counsel,* that he was the one who provided the information for the report and that the report said that Wonza, the bloodied man he encountered outside, told him that Ben, the man inside, "was also injured." en, the man inside, "was also injured."

a suspect become more limited over time, *see, e.g., People v. Miller,* 773 P.2d 1053, 1057 (Colo.1989) (reciting so-called *Dorman [v. U.S.,* 435 F.2d 385 (D.C.Cir.1970)] factors for later, warrantless arrest in the home); *id.* at 1058–1059 (Quinn, C.J. dissenting) (believing sufficient exigency existed where rape victim escaped while suspect slept, and returned before morning with police), the circumstances of an on-the-scene investigation of a recently reported crime necessarily require that officers be given greater latitude than for a subsequent, "planned," in-home arrest. *See generally* 3 Wayne R. LaFave, *Search and Seizure § 6.1(f)* at 273 (3d ed. 1996) ("On the other hand, when the occasion for arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant.")

The officers in this case clearly had probable cause to believe that a crime or crimes had recently been committed in the immediate vicinity of, if not actually inside, the defendant's apartment; and that the bloodied man outside, whatever else he might be, was at least the victim of an assault. The officers were directed by a bleeding man to the specific apartment from which he had just emerged, at 3:00 in the morning, following a commotion witnessed first-hand by citizen-informants, who are considered reliable for purposes of probable cause, as a matter of law, *see People v. Polander,* 41 P.3d 698, 702 (Colo.2001); *People v. Edmonds,* 195 Colo. 358, 364, 578 P.2d 655, 661 (1978), and found broken glass on a back window. Although the police understandably remained uncertain of precisely what had occurred, where it occurred, and whether other perpetrators or victims remained inside the apartment, I would find that this information amounted to probable cause to believe they would find perpetrators, or other victims in need of assistance, if they pursued the investigation immediately. I would find it not only permissible but essential for police officers pursuing a field investigation under these circumstances to ensure, to the extent that they did so in this case, that violent crimes were not continuing and that others were not in need of emergency assistance. Abandon-

ment, or even further delay, of the investigation at that stage would have been unthinkable.

In any event, however, it is well-established that probable cause of a crime is not a prerequisite to entering a dwelling to render emergency assistance. As we have previously noted, an officer's duty to render emergency assistance is separate from his duty to investigate crime. *See People v. Hebert,* 46 P.3d 473, 479 (Colo.2002) (quoting 1 American Bar Association *Standards for Criminal Justice §§ 1.1–1,* 1–2.2 (2d ed. 1986 Supp.): police have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses," including to "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," and "provide other services on an emergency basis"). While there must be more than a "theoretical possibility" of an emergency, we have described the needed quantum of suspicion as a "colorable claim" or a "reasonable basis" and held that entry pursuant to the emergency exception can be justified if the circumstances as they would have appeared to a prudent and trained officer at the time of the entry indicated an emergency threatening the life, safety, or in some cases, property, of another. *Id.,* at 479; *People v. Malczewski,* 744 P.2d 62, 66 (Colo.1987).

While the colorable claim of emergency threatening the safety of another need not arise in conjunction with the commission of a crime, it very well may and often does. In such situations, officers are often initially unable to distinguish possible perpetrators from victims and certainly cannot be expected to abandon precautions for their own safety or abandon their duty to provide emergency assistance altogether. Nor is the applicability of the emergency exception dependent upon entry for the sole, or even primary, purpose of rendering assistance. *People v. Unruh,* 713 P.2d 370, 379 (Colo. 1986) ("Under the emergency exception to the warrant requirement, police officers may enter private property without a warrant where there is a reasonable belief that the premises have been or are being burglarized in order to secure the premises and to search for suspects and victims.") While the emergency exception must be narrowly cir-

cumscribed to justify only conduct necessary to render immediate assistance, it is no less applicable merely because the officers also prepare, or even subjectively hope, to encounter the perpetrators of a crime. As long as the circumstances, as they would have appeared to a prudent and trained officer at the time of entry, indicate an emergency threatening the safety of another, evidence of a crime discovered in the process of providing that assistance or determining whether it is necessary need not be ignored. *Id.*

At the time the police entered the unlocked door above the stairway, they had information from citizen informants of a commotion in the area of the apartment in question, at 3:00 in the morning, suggesting the destruction of property and a possible assault or kidnapping of a female, and they had personally encountered a man leaving the immediate scene with a head injury, who reportedly told one of them that someone else was still inside, hurt. Under these circumstances, I would find that the police had at least reasonable grounds to believe that an assault of some kind had just occurred; that a number of people were involved, most of whom were unaccounted for; and that at least one other victim, and possibly perpetrator, remained inside. Further questioning of the bloodied man, who was apparently involved in the affray, before securing the scene and assessing his role would have been, as Officer Good suggested, both inconclusive and costly of precious time. *Cf. People v. Thompson,* 770 P.2d 1282, 1285–86 (Colo.1989) (reasonable to suspect that perpetrator was still in the house despite domestic abuse victim's assertions to the contrary). Similarly, I balk at the suggestion that the application of the emergency exception required the police to knock and announce themselves before entering, under circumstances in which it was only reasonable to assume that a crime might be ongoing and that some of the perpetrators of whatever recently occurred (or was occurring) remained inside.

The record indicates that the police met the defendant at the foot of the stairs, almost immediately upon entering, and after they conducted the most cursory of protective sweeps, he gave an incriminating response to Officer Good's question whether he possessed weapons or drugs. The court did not find that the officers impermissibly exploited their presence to conduct a general search of the premises or conducted any unlawful search or questioning of the defendant. It held simply that the emergency exception did not excuse their entrance without a warrant, and that all evidence and statements acquired after that point were the fruit of an unlawful entry, a finding not requested or anticipated even by the defendant.

I believe that the majority affirmance of this holding puts police officers conducting an immediate investigation of a suspected crime in an untenable position. I do not believe the Fourth Amendment jurisprudence of either this court or the United States Supreme Court would require them to endanger themselves or abandon all attempts to assist victims of possible recent or ongoing crimes, unless or until they could be sure they had acquired probable cause or the danger had passed. I would therefore reverse and remand for further proceedings to determine whether the disputed evidence was the product of unlawful interrogation or an unlawful search of the defendant's person.

I am authorized to state that Justice KOURLIS and Justice RICE join in this dissent.

