The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Lance BRUNSTING, Defendant–
Appellant.

No. 05CA2776.

Colorado Court of Appeals,
Div. II.

March 5, 2009.

John W. Suthers, Attorney General, Patricia R. Van Horn, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Katherine Brien, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CARPARELLI.

Defendant, Lance Brunsting, appeals the judgment of conviction entered on jury verdicts finding him guilty of unlawful possession of a schedule II controlled substance and possession of chemicals or supplies to

manufacture a schedule II controlled substance. He contends that sheriff's deputies acting without a warrant unlawfully entered the backyard of the house in which he lived, and that the trial court erred when it denied his motion to suppress the fruits of that unlawful search. According deference to the trial court's findings of historical fact and reviewing de novo its application of the legal standards to those facts, we conclude that the warrantless entry into and movement within the backyard was not justified under any recognized exception to the Warrant Clause of the Fourth Amendment. U.S. Const. amend. IV; *People v. Adkins*, 113 P.3d 788, 791 (Colo.2005) (standard of review of trial court suppression rulings).

Therefore, we reverse and remand.

## I. Undisputed Evidence

The salient facts are not in dispute. *See People v. Valdez*, 969 P.2d 208, 211 (Colo. 1998) (in appellate review of suppression ruling, "[w]hen the controlling facts are undisputed, the legal effect of those facts constitutes a question of law which is subject to de novo review").

Several sheriff's deputies responded to a ranch-style house about 11 p.m. Deputy C and Deputy E.S., who were the first to arrive, contacted Randy T., who had called dispatch to report that he had found his stolen vehicle parked in the driveway of the house. Deputy C testified that Randy T. told them a third person, whom he identified by name, had given him information relevant to the theft of his vehicle. Without providing further specificity, Randy T. reported that the third person told him he had talked with one of the people believed to have stolen the vehicle, that the latter had a gun at the time of that conversation, that the people involved in the theft of the vehicle were dangerous, that drugs were involved, and that the house had security cameras.

Sergeant D testified that, after he arrived at the scene, the other deputies told him that Randy T. had reported that a vehicle parked in the driveway was his and had been stolen. Sergeant D also testified that he understood that Randy T. was concerned that the individuals in the house had guns and were making methamphetamine. He testified that it was his understanding that Randy T. had approached the house and overheard people inside comment that they had guns. When the prosecution asked what he had heard about the methamphetamine, Sergeant D testified that he did not "exactly recall 100 percent."

The deputies saw several vehicles in the driveway of the house and on the sidewalk, including the vehicle that Randy T. alleged was his. Not long after they arrived, the deputies saw a woman and her two daughters leave the house. The woman told Deputy C she was the owner of the house. When Deputy C told the woman they were investigating a report of a stolen vehicle, the woman became agitated, raised her voice, and denied stealing the vehicle. Suspecting that the woman was trying to alert those inside the house to the deputies' presence, Deputy C asked her to lower her voice. The woman complied and told him that the vehicle belonged to a person named Randy, that a man named Jeff had driven the vehicle to the house, and that Jeff was in the lower level of the house with three other people. When Deputy C asked for permission to enter the house, the woman loudly refused. Another deputy then escorted her away from the house and detained her while the other deputies continued their investigation.

Deputy C and Sergeant D looked in the vehicle and saw that the stereo and speakers had been removed. Deputy C testified that when inspecting the vehicle, he noticed there were several security cameras around the house. After some discussion, the deputies decided to go to the front door to attempt to contact those in the house. Deputy C testified that he then went to the west side of the house "to cover the backyard."

The entire backyard of the house was enclosed by fencing, most of which was a wooden privacy fence. However, on the northwest corner of the house, next to the garage, there was a chain link fence and gate through which Deputy C entered the yard. He testified that "[t]he main reason [he entered] was that if there was someone going to try to flee the residence when we made

contact, and also for officer safety reasons, in case someone would come around the house and come out to the front and engage [the deputies]." Deputy C also testified that he saw a video security camera mounted on the northwest corner of the west-facing garage. He stated that, to avoid being seen by anyone who might be monitoring the camera feed, he went to the end of the fence that separated the two yards, ran to the garage beneath the camera, and entered the yard through the gate. Once in the yard, he positioned himself near bushes where it was dark.

From his position near the bushes, Deputy C saw "[a man's] head come out from the wall" where he was standing. Deputy C testified that the man looked in his direction, then in the other direction, and then disappeared back around the corner. Deputy C then drew his weapon, went around the corner, and told the man to stop and put his hands up. The man looked toward the stairs as if he was going to go down, but then stopped. Deputy C testified that he traveled about twenty feet from the bush to where the man was, put the man against sliding glass doors adjacent to the back door of the residence, and handcuffed him. He testified that he stopped the man for "officer safety reasons" and to prevent him from fleeing the scene.

As Deputy C began a pat-down search of the man, he saw a woman at the bottom of the stairs, told her to come out of the house, and handcuffed her. While he was doing so, he saw another man down the stairs, ordered him to come out, handcuffed him, and patted him down. Sergeant D testified that he heard Deputy C announce over the radio that three people had come out the back door, and that he heard this after he had gone to the front door, knocked a few times, and yelled "sheriff's office."

Defendant contends Deputy C's entry into the backyard was unlawful, and that it was the "poisonous tree" that tainted all the incriminating evidentiary "fruit" later discovered inside the house. We agree.

## II. Analysis

### A. Reasonable Expectation of Privacy

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, government officials are generally required to obtain a warrant before conducting a search. *See United States v. Karo,* 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984) (stating that warrantless searches are presumptively unreasonable).

Courts have recognized that the curtilage immediately surrounding a private house is entitled to the same level of protection as is a residential dwelling because it harbors the "intimate activity associated with the 'sanctity of a [person's] home and the privacies of life.' " *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)); *People v. Melton,* 910 P.2d 672, 678 (Colo.1996) (Mullarkey, J., specially concurring).

■ "[A]bsent exigent circumstances a warrantless search of one's home or its curtilage, when effected through trespass, violates the fourth amendment." *United States v. Van Dyke,* 643 F.2d 992, 993 (4th Cir.1981).

Here, defendant alleged that the fenced backyard was an area where he had a reasonable expectation of privacy, and the prosecution conceded the question at the suppression motion hearing. The People do not argue otherwise on appeal. Nor do they contend the deputies had any reason to believe the back door of the house was an entrance that was expressly or impliedly held open to visitors. And further, this is not a case in which knocking at the front door was unsuccessful and the officer's intrusion into the curtilage was a "reasonable step[] to speak with the person being sought out." *Hardesty v. Hamburg Township,* 461 F.3d 646, 654 (6th Cir.2006) (citing cases from the Third and Ninth Circuits also upholding entries into curtilage to contact a resident after attempts at front door were unsuccessful); *see Kirsche v. State,* 271 Ga.App. 729, 611

S.E.2d 64, 67–68 (2005) (acknowledging that it is not unusual for an officer to go to the back door to contact a resident if the officer is unable to make contact at the front door, but distinguishing that scenario from an officer's decision to enter a backyard without first failing to receive a response at the front door). Rather, the undisputed evidence establishes that Deputy C entered the backyard to stop occupants from fleeing and from posing a threat to deputies at the front door and that he did so before the other deputies knocked on the front door.

## B. Entry into the Backyard

■ Because a warrantless search of an area subject to a constitutionally reasonable expectation of privacy is presumptively unreasonable, *Karo*, 468 U.S. at 714–15, 104 S.Ct. at 3303, the burden is on the prosecution to prove that a warrantless intrusion was justified by one of the well-established exceptions to the Warrant Clause of the Fourth Amendment. *People v. Pate*, 71 P.3d 1005, 1010 (Colo.2003). "To determine whether the prosecution has met its burden, courts must examine the totality of the circumstances as they would have appeared to 'a prudent and trained police officer' at the time the decision to conduct a warrantless entry was made." *Pate*, 71 P.3d at 1010.

### 1. Exception to the Warrant Requirement

Here, although the trial court denied the suppression motion without saying which exception to the warrant requirement it found applicable, it is apparent the court relied on the exigent circumstances exception.

■ Exigent circumstances are circumstances that necessitate immediate police action. *Pate*, 71 P.3d at 1010; *People v. Kluhsman*, 980 P.2d 529, 534 (Colo.1999). Under this exception, the prosecution was required to prove that (1) the deputies had probable cause, and (2) there were exigent circumstances that justified the warrantless entry. *Kluhsman*, 980 P.2d at 534.

### 2. Probable Cause

■ "Probable cause refers to the reasonable belief that evidence exists establishing

the basis to arrest, conduct a personal or property search, or obtain a warrant." *People v. Tallent*, 174 P.3d 310, 314 (Colo.2008)).

Here, the trial court found that the deputies had a right to go into the backyard "to protect themselves, and not just themselves, but the community ..., and that their entry into the backyard was reasonable. This was not an unreasonable search." However, the trial court did not state whether the deputies had probable cause, or, if so, on what basis it existed.

Nevertheless, it is evident to us the trial court determined that the statements of Randy T. and the woman whom the deputies asked for permission to enter the house, in combination with the deputies' observations of the vehicle, gave the deputies probable cause to believe (1) Randy T.'s vehicle had been stolen; and (2) the person who had stolen the vehicle was inside the house. We agree with this essential determination. *See People v. Fortune*, 930 P.2d 1341, 1345 (Colo. 1997) (the presumption of reliability applicable to citizen-informers includes victims, absent evidence to the contrary).

By contrast, Randy T.'s statements to Deputies C and E.S. about illegal drugs being present in the house were based on hearsay and were not specific. Based on the testimony of Deputies C and E.S., it appears that Randy T. related hearsay statements indicating the car thief and others in the house were involved with "drugs" without (1) identifying the type of "drugs" the declarant was referring to; (2) indicating the basis of the declarant's knowledge; (3) revealing whether the declarant was a person from a criminal environment; or (4) disclosing whether the declarant's statements were based on current or stale information. The deputies did not testify that Randy T. had said he had overheard any discussion drugs when he approached the house and overheard the references to "guns." Other than to say that he talked to the deputies who had talked with Randy T. and that he did not "exactly recall 100 percent," Sergeant D did not testify how he came to understand that Randy T. had said there was methamphetamine in the residence.

■ On this record, we conclude the deputies lacked probable cause to believe there were illegal drugs in the house, let alone methamphetamine manufacturing activities, when Deputy C entered the backyard and when he moved to the back door, saw into the house, and ordered occupants to come out. *See People v. Miller*, 75 P.3d 1108, 1113 (Colo.2003) (whether information is current or stale plays an important role in the totality of the circumstances analysis used to determine probable cause); *Fortune*, 930 P.2d at 1345 (when information relied on to establish probable cause originates from a person from a criminal environment acting out of self-interest, there must be evidence of adequate circumstances to justify the officer's belief in the informer's credibility or the reliability of the information); *People v. Titus*, 880 P.2d 148, 151 (Colo.1994) (police lacked probable cause to believe marijuana was being sold from residence where informant made vague claims that she smelled burning marijuana emanating from the residence "on several occasions," did not specify when this had occurred, and did not state she had seen marijuana being used, or that she had participated in a sale).

■ Similarly, as the trial court correctly observed, Randy T.'s statements about the presence of guns in the house were not necessarily indicative of criminal activity. Because Randy T. did not tell the deputies what type(s) of guns were in the house, the deputies did not have specific information upon which to conclude the occupants possessed illegal firearms. Nor did Randy T. tell the deputies that any occupant of the house was without legal authority to possess a firearm. Thus, although the deputies had a reasonable suspicion that the occupants of the house were armed, they did not have probable cause to investigate a weapons violation.

Accordingly, in analyzing whether exigent circumstances existed, we do so only with respect to the sole offense for which the deputies possessed probable cause—the vehicle theft.

### 3. Exigent Circumstances

■ Exigent circumstances to justify a warrantless entry exist when:

(1) the police are engaged in "hot pursuit" of a fleeing suspect;

(2) there is a risk of immediate destruction of evidence; or

(3) there is a colorable claim of an emergency situation threatening the life or safety of another.

*Pate*, 71 P.3d at 1010; accord *Kluhsman*, 980 P.2d at 534.

■ Law enforcement officers may also conduct a warrantless search when they believe their own lives are at risk. *People v. Aarness*, 150 P.3d 1271, 1278 (Colo.2006) (citing *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967) (holding the warrantless entry and search of a residence lawful where police had information that an armed robbery suspect was inside)). "To establish that there was a colorable claim of emergency threatening the life or safety of another, also known as the 'emergency aid exception,' there must be a showing of immediate crisis inside the home and the probability that police assistance will be helpful in alleviating that crisis." *Aarness*, 150 P.3d at 1278. Because "[t]he exigent circumstances doctrine runs counter to Fourth Amendment guarantees ..., the scope of the exception must be strictly circumscribed by the exigencies which justify its initiation." *People v. Hogan*, 649 P.2d 326, 331 (Colo.1982).

■ Here, the People do not rely on the first two factors set forth above (and the trial court did not find the deputies were in "hot pursuit," or that there was a risk the occupants of the house would destroy evidence relating to the stolen vehicle). Rather, the People contend that the exigent circumstance justifying the deputies' entry in the backyard was their "reasonable ... belie[f] that their lives *might be in danger* when they knocked on the door to ask about the vehicle." (Emphasis added.) Hence, we must determine whether, when Deputy C first entered the backyard and later moved to the back door, there was a colorable claim of an emergency situation threatening the life or safety of the deputies (or others) sufficient to justify the entry. We conclude there was not.

In *Aarness,* the police had information that the defendant, an armed parole violator with two outstanding warrants, was located in an apartment. After confirming the existence of the warrants, the police knocked on the door of the apartment, the door was opened by one of the apartment's occupants, through the open door the police saw the seated defendant put his hand in the seat cushion, and the police ordered him to show his hands. The supreme court concluded it was reasonable for the police to believe the defendant was reaching for a weapon, the exigency arose *after he did so,* and the subsequent warrantless entry was justified. The court noted that police officers cannot manufacture an exigency to evade the warrant requirement, but concluded that *the defendant's actions created the exigency* and that the police did not manufacture the circumstances justifying their entry. *See Aarness,* 150 P.3d at 1279 (citing *United States v. Anderson,* 154 F.3d 1225, 1234 (10th Cir.1998), for the proposition "that exigent circumstances that the police knowingly created cannot justify their warrantless entry").

Here, it is the obligation of the People—as the party bearing the burden of proving the applicability of the exigent circumstances exception—to make a colorable claim that, when Deputy C entered the backyard and when he moved to the back door, it would have appeared to a prudent and trained police officer that an emergency situation already existed and threatened the deputies' lives or the safety of others.

Except for the testimony that the owner spoke in a loud voice, the record does not show, and the People do not argue, that when Deputy C entered the backyard, circumstances required an immediate warrantless entry in response to a risk of immediate destruction of the vehicle or an immediate threat to the deputies or others. There is no evidence that anyone inside the house was in danger or that the allegedly stolen vehicle was in danger of destruction. Unlike the circumstances in *Aarness,* before Deputy C entered the backyard, he did not have an arrest warrant and did not observe a felon believed to be armed possibly reach for a weapon. Nor did Deputy C testify that the first man he apprehended made any movements that could be interpreted as posing an immediate threat to the deputy before he moved about twenty feet further into the yard.

Nor does the record show that when Deputy C entered the yard, circumstances were already evolving so quickly that the deputies, could not have (1) positioned themselves outside the curtilage; (2) secured the vehicle; (3) observed the backyard and the exits from that position; (4) stopped anyone leaving the backyard and conducted a pat-down search for weapons; and (5) protected the deputies at the door from being attacked from behind. To the extent the cameras made it more difficult to do so, they did not *create* an emergency situation that threatened the lives of the deputies, and, thus, they did not constitute an *exigency* justifying warrantless entry into the curtilage. In addition, the record is insufficient to show that when the man came out the back door and looked around, Deputy C had any further reason to believe that the man posed either a risk of immediate destruction of the vehicle or an immediate threat to the deputies' lives or the safety of others.

Considering the totality of the circumstances, we conclude that before Deputy C entered the backyard, circumstances were not evolving so quickly that the deputies could not have obtained a warrant, that there was no exigency justifying Deputy C's entry into the backyard and movement to the back door, and, thus, that his actions violated defendant's Fourth Amendment right of privacy.

### 4. Actions Stemming from the Unlawful Entry

Once Deputy C apprehended the man in the backyard and the woman he had seen at the bottom of the stairs, the situation progressed quickly. Deputy J.S. responded to Deputy C's loud commands by jumping the fence and entering the backyard to help. Deputy C then saw another man in the house, ordered him out at gunpoint, and handcuffed him.

After Deputy J.S. entered the backyard, he looked through a basement window and

saw a burner, some beakers, and other objects which he recognized as indicative of a methamphetamine production facility. Deputy C also discovered that the first man he had apprehended had dropped a handgun.

Three deputies then entered the house with their guns drawn and found defendant hiding under the basement stairs. During a pat-down search, a deputy discovered a syringe and a baggie containing a substance that was later identified as methamphetamine.

The house was secured and a drug task force agent was called to the scene. After the agent arrived, he was directed to the backyard where Sergeant D pointed out the basement window and the suspected drug manufacturing equipment that could be seen through the window. The agent then obtained a search warrant based on the information obtained from Randy T. and the homeowner, the deputies' reports of what had happened and what they had seen at and in the residence, and what he had seen through the basement window. The subsequent search led to physical evidence introduced at trial.

### 5. The Tainted Evidence

Although Deputy J.S. entered the backyard to help Deputy C, we have concluded Deputy C was in the backyard, and had moved to the back door, unlawfully. Therefore, Deputy J.S.'s entry into the backyard was also unlawful. *See People v. Hogan*, 649 P.2d at 331 ("If a purported exigency arising directly from a violation of the warrant requirement can serve as the legal basis for the officers' warrantless entry into the home, then the warrant requirement serves no meaningful function and the enhanced privacy interest attaching to one's residence is illusory.").

It is undisputed that Deputy J.S. would not have seen the evidence of methamphetamine manufacturing through the basement window if he had not entered the backyard. Therefore, Deputy J.S.'s report of his observation of this evidence was tainted by the unlawful entry and cannot serve as probable cause for the other deputies' warrantless entry into the house.

### III. Conclusion

In summary, we conclude the trial court erred by denying defendant's suppression motion. In light of this disposition, we need not consider the People's argument that Deputy J.S.'s observation of the drug manufacturing equipment and the information that there was a fourth person in the house justified the deputies' subsequent entry into the residence to conduct a protective sweep as permitted by *Maryland v. Buie*, 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (police may conduct a protective sweep of a residence to assure their safety after they lawfully enter the residence to execute an arrest warrant and there are articulable facts and rational inferences supporting a reasonable belief that the area to be swept harbors an individual who poses a danger to those on the arrest scene). In addition, we need not address defendant's remaining contentions relating to the jury instructions.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

Judge TAUBMAN concurs.

Judge CONNELLY dissents.

Judge CONNELLY dissenting.

The majority holds Arapahoe County law enforcement officers violated the Fourth Amendment by entering a fenced backyard as a security measure while other officers approached the front door. I respectfully disagree. The reasonableness of police actions should be determined by balancing the intrusion on privacy against the need for the intrusion. In my view the intrusion here (entry of backyard "curtilage") was outweighed by officer safety interests.

The privacy protection of the home is " '[a]t the very core' of the Fourth Amendment." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Because "physical entry of the home is the chief evil" guarded against by the Fourth Amendment, "[i]t is a basic principle

of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585–86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (internal quotations omitted).

But a warrant is not always required to enter a home. Rather, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The warrant requirement may give way if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (internal quotations omitted); *see generally People v. Aarness*, 150 P.3d 1271, 1277–80 (Colo.2006).

The Fourth Amendment also protects the home's "curtilage," those areas closely proximate to the home that are used for intimate home activities. *See United States v. Dunn*, 480 U.S. 294, 300–03, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Police sometimes may enter curtilage, however, even where they could not enter the home itself. It is well settled, for example, absent probable cause or reasonable suspicion, that simply going up to a home's front door to "knock and talk" does not violate the Fourth Amendment. *See, e.g., United States v. Gould*, 364 F.3d 578, 590 (5th Cir.2004) (en banc). And most courts have held such officers may proceed through backyard curtilage, to knock on a rear door, where occupants have not responded to knocks on the front door. *See, e.g., Hardesty v. Hamburg Township*, 461 F.3d 646, 654 (6th Cir.2006) (citing cases from the Third, Fourth, Eighth and Ninth Circuits); *accord United States v. Daoust*, 916 F.2d 757, 758 (1st Cir.1990) (Breyer, J.).

Thus, while the Fourth Amendment protects curtilage, entering a backyard is not as intrusive as entering the home itself. At least where countervailing officer safety interests are asserted, we should recognize this lesser degree of intrusiveness in deciding the ultimate reasonableness of a backyard entry.

I would apply a balancing test drawn from *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), which allows "protective sweeps" after lawful in-home arrests. *Buie* "balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 331, 110 S.Ct. 1093. The Court took the controlling standard from its seminal case allowing protective "frisks" for weapons during investigatory stops. *Id.* at 331–32, 110 S.Ct. 1093 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). It allowed protective sweeps "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337, 110 S.Ct. 1093; *see also id.* at 336, 110 S.Ct. 1093 (requiring "a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene"). If so, officer safety interests outweigh the Fourth Amendment intrusion, and "a warrant [is] not required." *Id.* at 334, 110 S.Ct. 1093.

As in *Buie*, the constitutionality of the officers' actions here requires a balancing of the privacy intrusion against officer safety concerns. Because the backyard entry here was less invasive of privacy than an in-home sweep, the controlling standard should not be any more demanding than the *Buie* standard. Accordingly, the officers properly could have entered the backyard if they reasonably believed, based on specific and articulable facts, that doing so was necessary to protect their fellow officers legitimately approaching the front door.

I would conclude that the officers here sufficiently articulated specific facts justifying the backyard entry as a reasonable safety measure. They had probable cause that a car thief was inside the home, and a citizen had told them the occupants were armed and dangerous. The homeowner had responded loudly to the officers' legitimate questions, in a manner the officers believed was meant to signal their presence to the remaining occupants. And the officers reasonably were concerned they could not safely protect their fellow officers approaching the front door by remaining in view of video security cameras positioned to monitor the front and sides of the house.

The officers reasonably decided the exigencies of this fast-developing situation required immediate action. It is true that exigent circumstances cannot excuse the need for a warrant if the officers themselves "created" or "manufactured" the exigencies. *Aarness,* 150 P.3d at 1279–80. But *Aarness* held police did not impermissibly create their own exigencies by approaching and knocking on an apartment door to investigate an anonymous tip that an armed fugitive was there. *Id.* It is even more clear here that the police did not create their own exigencies by knocking on the front door because, unlike in *Aarness,* the armed occupants could have known of the police presence before the police knocked.

The issue then becomes whether the Fourth Amendment was violated by the officers' later entry of the home to secure the premises. By the time of the entry, the police had learned several additional facts confirming the home was being used for drug manufacturing by armed individuals. First, from their backyard view into the basement window, the police observed drug manufacturing equipment. Next, in the course of temporarily securing three of the four remaining occupants, a semi-automatic handgun fell from one man's pants. Finally, the police understood, from the homeowner's initial admission, that at least one person still remained inside the house.

Police can enter a home without a warrant if there are exigent circumstances, such as to "prevent the imminent destruction of evidence," *Brigham City,* 547 U.S. at 403, 126 S.Ct. 1943 (citing *Ker v. California,* 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)), or "if they believe their own lives ... are at risk." *Aarness,* 150 P.3d at 1278. Here, the officers did not act unreasonably in entering and securing the house, based on both those justifications, pending issuance of a search warrant. I accordingly would hold that the district court properly declined to suppress the drugs ultimately seized pursuant to a search warrant.