23CA1655 Peo v Henry 01-08-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1655
City and County of Denver District Court No. 20CR5080
Honorable Kandace C. Gerdes, Judge
Honorable Jennifer B. Torrington, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Adawnous Donnil Henry,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GOMEZ
Welling and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

M. Linton Wright, Alternate Defense Counsel, Lafayette, Colorado, for Defendant-Appellant

¶ 1    Defendant, Adawnous Donnil Henry, appeals the judgment of conviction entered after a jury found him guilty of two counts of distribution of controlled substances, two counts of possession of controlled substances, illegal discharge of a firearm, and third degree assault.  He contends that the trial court reversibly erred by (1) denying his motion to suppress evidence obtained as a result of a warrantless search of his house; (2) accepting his waiver of his right to counsel; and (3) admitting evidence about suspected bomb-making materials found in a search of his house.  We disagree. Therefore, we affirm the judgment.

I.    Background

¶ 2    Early one morning, officers responded to reports of gunshots in a residential area.  When officers arrived on the scene, they found a woman — later identified as Raqhel Williams — hiding behind a vehicle on the back side of the house.  Officers later observed a handgun under the vehicle she'd been hiding behind.

¶ 3    Officers also found a man — later identified as Henry — in the front yard of a neighboring house with a gunshot wound and a rifle within his reach.  He was transported to the hospital and received medical treatment for the gunshot wound and a head injury.

1

¶ 4     Williams and Henry gave investigating officers conflicting accounts as to what had led to the shooting.

¶ 5     Williams told officers that she'd been using Henry's computer when he grabbed her by the neck and started choking her.  She said that she was able to grab a knife from Henry and swing it at him.  Then, she said, she grabbed a gun that had fallen out of his waistband and shot at him multiple times before fleeing the house.

¶ 6     Henry told officers that he lived in the house and that he'd invited Williams over, and they'd had consensual sex, after which he fell asleep and woke up to her attempting to rob him.  According to Henry, Williams had a gun in her hand, and when he tried to grab it, she shot him in the abdomen.  Henry said he grabbed a rifle, began shooting back, and then fled to the neighbor's front yard and shot toward their house to prompt them to call the police.

¶ 7     After their initial interviews with Henry and Williams, officers conducted a warrantless sweep of the house.  They reported that during that initial search, they didn't find anyone else in the house but observed narcotics and other items of interest in plain view.  Based on these observations, they obtained a search warrant.

Upon executing the warrant, they seized various controlled substances and other evidence from the house.

¶ 8     Henry was charged with several counts relating to the shooting and the items found in the house. Neither Williams nor Henry testified at trial, but the jury heard testimony about and saw video recordings of their interviews with officers. After the trial, the jury found Henry guilty of two counts of distribution of controlled substances (cocaine and psilocyn), two counts of possession of a controlled substance (methamphetamine and methylenedioxymethamphetamine), one count of illegal discharge of a firearm, and one count of third degree assault.

¶ 9     This appeal followed.

## II.     Suppression Ruling

¶ 10    Henry contends that the trial court erred by denying his motion to suppress evidence obtained as a result of the warrantless search of the house. Specifically, he claims that the search wasn't justified by exigent circumstances and exceeded the scope of any such circumstances. He also claims that the evidence presented at trial undermined the factual findings the court had made after the suppression hearing and, thus, that the court plainly erred by not

3

revisiting its earlier decision and excluding the challenged evidence at trial. We disagree with both contentions.

## A. Additional Facts

¶ 11 Based on the initial warrantless search of the house, officers obtained a search warrant. The affidavit in support of the warrant stated that, during that initial search, officers "observed narcotics, paraphernalia, shell casings and ammunition in plain view."

¶ 12 Henry filed a motion to suppress the evidence seized with the search warrant based on the invalidity of the initial warrantless search. After a hearing, the trial court denied the motion, concluding that the warrantless search was justified by the exigent circumstances exception to the warrant requirement and was reasonable in scope. The court explained,

> [T]here was clearly a colorable claim of emergency threatening the life or safety of another which justified a warrantless entry into the home or other premises . . . .
>
> So the circumstances in which they found themselves were that . . . they had a call of a shooting. I have the first victim who is injured; one officer was speaking to her; Mr. Henry was lying on the ground with an obvious wound and said that somebody had shot him, and then identified the place where — I don't mean on his physical person, but that the shooting

4

had occurred in his home. And the police had sufficient justification at that point to enter the home . . . .

. . . .

[Officers] needed to determine if there was anybody else who could have been injured who was in the home or if the shooter was still on the premises.

¶ 13     The court further concluded that "the search that [officers] conducted was reasonably related to the exigencies they sought to address," and "[t]he things that they found in this home were in plain view."

¶ 14     At trial, the evidence showed that drugs were found in the house in a cooler in a trapdoor area, in a duffle bag inside a closet, and in a pocket in William's bag.

## B.     Applicable Legal Standards

¶ 15     Our review of a trial court's suppression order presents a mixed question of law and fact. *People v. Thompson*, 2021 CO 15, ¶ 15. We defer to the court's factual findings, such as findings of historical facts underlying a search, if those findings are supported by the record. *See id.* But we assess de novo the legal significance of those facts, such as whether a search was constitutional. *See People v. Berdahl*, 2019 CO 29, ¶ 18.

¶ 16    The United States and the Colorado Constitutions both protect an individual's right against unreasonable searches and seizures. *See* U.S. Const. amend. IV; Colo. Const. art. II, § 7; *People v. Oates*, 698 P.2d 811, 814 (Colo. 1985).  A search of a home without a warrant is presumptively unreasonable unless it is justified by an exception to the warrant requirement.  *United States v. Karo*, 468 U.S. 705, 717 (1984); *People v. McKnight*, 2019 CO 36, ¶ 23.

¶ 17    One such exception is that a warrantless search is justified by exigent circumstances, when "the public's interest in a timely police response to emergent and fast-developing situations outweighs the individual's privacy interests." *People v. Brunsting*, 2013 CO 55, ¶ 25.  As relevant here, this exception may apply if "there is a colorable claim of an emergency situation threatening the life or safety of another." *People v. Pate*, 71 P.3d 1005, 1010 (Colo. 2003); *accord People v. Gillespie*, 2024 COA 98, ¶ 41.  The two requirements to apply this exception are that (1) officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others and (2) the manner and scope of the search is reasonable.  *Brunsting*, ¶ 31.

¶ 18    Our supreme court has identified several factors relevant to determining whether there is a colorable claim of an emergency. *Id.* at ¶ 30.  These factors include

- the gravity or violent nature of the offense involved;

- whether there is probable cause to believe the suspect committed the offense;

- whether there is strong reason to believe the suspect is on the premises;

- whether the suspect is reasonably believed to be armed;

- the risk posed to other persons from unnecessary delay; and

- the circumstances of the entry, including whether it was made at night and whether it was made peaceably.

*Id.*; *People v. Licona-Ortega*, 2022 COA 27, ¶ 27.

¶ 19    When exigent circumstances justify a warrantless entry into a home, "[t]he scope of the permissible intrusion is determined by the exigency justifying the initiation of the warrantless entry." *Gillespie*, ¶ 41 (quoting *People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006)).

¶ 20    As a safeguard for an individual's constitutional rights, the exclusionary rule "'forbids the use of improperly obtained evidence

at trial,' as well as 'evidence later discovered and found to be derivative of an illegality.'" *Casillas v. People*, 2018 CO 78M, ¶ 19 (first quoting *Herring v. United States*, 555 U.S. 135, 139 (2009); and then quoting *Utah v. Strieff*, 579 U.S. 232, 232 (2016)).

## C.     Exigent Circumstances

¶ 21     We conclude that the trial court properly denied Henry's motion to suppress on the basis that the warrantless search of the house was justified by exigent circumstances.

¶ 22     Officers arrived on scene to a reported shooting and found Williams nearby, acting "extremely hysterical" and saying she'd been shot at.  Officers also found Henry in the front yard of a neighboring house with a gunshot wound.  In addition to the violent nature of the offense, officers in the back yard were receiving different information than those in the front yard, making it difficult to determine who was a victim and who was a suspect.

¶ 23     Also, while Williams and Henry both reported that they were alone at the house, Henry made conflicting statements, some of which suggested that the woman who had shot him could still be in the house, and he didn't initially provide the woman's name. Officers thus couldn't be sure whether Williams was that woman or

whether Williams and Henry were telling the truth about no one else being at the house.  Indeed, some neighbors had reported seeing another woman earlier, and responding officers believed they'd heard three gunshots coming from the direction of the house after they had made contact with Williams.

¶ 24     Based on these circumstances, officers had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of themselves or others.  *See Brunsting*, ¶ 31.  Specifically, they had reasonable grounds to believe that they or the public could be endangered if there was a shooter or another victim inside the house.  And although by the time they entered the house they had spent about an hour tending to Williams and Henry, getting information from them, and loudly ordering anyone in the house to come out, there was adequate reason to suspect that someone might still be hiding inside with a gun or might be injured inside and unable to leave or call out — and it was reasonable for them to conduct a sweep of the house to be sure.

¶ 25     Accordingly, we agree with the trial court's conclusion that the initial warrantless search of the house was justified by the exigent circumstances exception to the warrant requirement.

¶ 26    We also agree with the trial court's conclusion that the manner and scope of the search were reasonable.  *See id.*  Henry argues that the body camera video shows that "officers continue[d] to search the home after they determined that no one else was present."  But the hearing testimony and bodycam evidence showed that, after officers visually cleared the rooms, they were instructed to double-check closets, cabinets, and crawl spaces where someone could be hiding before leaving the house.  Given the exigencies of the situation, it was reasonable for them to do so.

¶ 27    Finally, we reject Henry's argument that the trial court erred in concluding that the search was reasonable in scope, as the drugs officers observed were in fact not in plain view.  There was no evidence before the trial court at the time of the suppression hearing to rebut the officers' assertions that the drugs were in plain view.  *See Thompson*, ¶ 15; *see also People v. Singley*, 2015 COA 78M, ¶ 26 (an appellate court confines itself to the evidence developed at the suppression hearing when assessing whether the trial court erroneously denied a defendant's suppression motion).  Henry points out that the officers didn't testify at the hearing that they observed any drugs in plain view.  But an officer had already

10

averred that fact in the search warrant affidavit submitted to the court in conjunction with the hearing, and the prosecutor alluded to it in her argument at the hearing. Henry never challenged that averment, either in his motion to suppress or at the hearing. Thus, we discern no error in the court's finding that the officers observed the drugs and other items in plain view.

### D.    Plain Error Regarding the Drugs Being in Plain View

¶ 28    Henry further contends that the trial court plainly erred by admitting the evidence seized from the house during the trial because the evidence presented at trial revealed — contrary to the search warrant affidavit — that the drugs couldn't have been in plain view. *See Singley*, ¶ 26 (an appellate court may consider "the entire record" if a party asserts that the trial court plainly erred in relation to a suppression issue). We aren't persuaded.

¶ 29    An error is plain when it is both obvious and substantial, such that it "so undermine[d] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Buckner*, 2022 COA 14, ¶ 43.

¶ 30    Crim. P. 41(e) provides that a motion to suppress "shall be made and heard before trial unless opportunity therefor did not

11

exist or the defendant was not aware of the grounds for the motion, but the court, in its discretion, may entertain the motion at the trial." This rule "require[s] the parties . . . to pursue discovery vigorously prior to trial." *People v. Tyler*, 874 P.2d 1037, 1039 (Colo. 1994).

¶ 31 We conclude that because the trial court would've had discretion to decline to consider a renewed motion to suppress the challenged evidence at trial had Henry brought such a motion, the court didn't plainly err by admitting the evidence. Indeed, if, as Henry claims, the drugs couldn't have been in plain view during the initial warrantless search of the house, then that fact was reasonably discernable prior to trial through due diligence. Thus, the issue could've been raised at the suppression hearing or otherwise in advance of trial, and the trial court could have denied any suppression motion made at trial on the basis that it was too late to consider the issue. *See People v. Hastings*, 983 P.2d 78, 82-83 (Colo. App. 1998) (trial court properly denied as untimely a suppression motion made during trial, even though the motion was based on testimony not presented until the trial, because the defendant knew about the potentially illegal search from the

moment it occurred), *aff'd on other grounds sub nom.*, *Gorman v. People*, 19 P.3d 662 (Colo. 2000).

### III.   Waiver of the Right to Counsel

¶ 32   Henry also contends that the trial court erred by granting his motion to represent himself because his waiver of his right to counsel was ineffective.  We aren't persuaded.

### A.   Additional Facts

¶ 33   During his altercation with Williams, Henry sustained a traumatic brain injury (TBI).

¶ 34   Before trial, the issue of competency was raised, and the court ordered an evaluation of Henry.  The evaluation revealed the following:

- Henry was diagnosed with dyslexia as a child, and he reported having received "special education services for dyslexia 'most' of his life."

- Henry said he believed he sustained a stroke in 2020.

- Henry's attorney indicated that Henry has difficulty retaining information and has a history of TBI.

- The evaluator stated that Henry reported his memory had "vanished" since "the incident" but noted that, in fact,

13

"he discussed all topics with no significant memory impairment noted."

- The evaluator remarked, "[O]verall, [Henry's] thought process was goal-directed and linear. . . . His speech was clear and coherent. His thoughts were simple but appeared logical. No significant confusion was noted. . . . Throughout the evaluation, he maintained satisfactory attention, did not evidence cognitive impairment or disorientation, and showed no difficulty understanding me or conveying his thoughts."

- The evaluator added that Henry "displayed an understanding of his current legal situation." She went on to describe how he was able to identify all his charges, display an understanding of the class level of his charges, provide responses regarding his preferred legal strategy, note some evidentiary issues, and discuss the possible consequences he might face if convicted.

- The evaluator opined that Henry "d[id] not currently have a mental disability or developmental disability that prevent[ed] him from having sufficient present ability to

14

consult with his lawyer with a reasonable degree of rational understanding in order to assist in his defense, or prevent[ed] him from having a rational and factual understanding of the criminal proceedings."

¶ 35    Based on the results of the evaluation, the trial court concluded that Henry was competent to stand trial. At no point — including on appeal — has Henry challenged the court's competency determination.

¶ 36    On multiple occasions before trial, Henry expressed a desire to speak for himself rather than through his attorney.

¶ 37    Shortly before trial, Henry moved for a hearing under *People v. Arguello*, 772 P.2d 87 (Colo. 1989), which the court granted. At the hearing, Henry expressed a desire to waive his right to counsel and represent himself with advisory counsel. The court gave Henry an *Arguello* advisement, during which Henry indicated that he understood the nature of the charges against him and the consequences of representing himself. He also indicated that he could "barely" read, write, and understand the English language, though he later said that he could "follow" the advisement form, which he was given a copy of at the start of the advisement, "along

with [the court]." The court noted that Henry seemed confused at times but worked to further explain those topics to him. At the end of the hearing, the court permitted the public defender's office to withdraw as counsel and allowed Henry to proceed pro se with advisory counsel.

## B. Applicable Legal Principles

¶ 38 A defendant's right to legal counsel is protected under both the United States and the Colorado Constitutions. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16; *Arguello*, 772 P.2d at 92. As a corollary to the constitutional right to counsel, "a defendant has the alternative right to self-representation." *Arguello*, 772 P.2d at 92; *see also People v. Romero*, 694 P.2d 1256, 1263-64 (Colo. 1985) ("[T]he express guarantee of the right to counsel implicitly embodies a correlative right to dispense with a lawyer's help . . . .").

¶ 39 If a defendant requests to represent themself, the court must "conduct a specific inquiry on the record to ensure that the defendant is voluntarily, knowingly and intelligently waiving the right to counsel" before it can grant the request. *Arguello*, 772 P.2d at 95; *accord People v. Davis*, 2015 CO 36M, ¶ 15.

¶ 40     A waiver is knowing and intelligent if the record clearly shows that the defendant understood the nature of the charges, the statutory offenses included within those charges, the range of potential punishments, the possible defenses to the charges and circumstances in mitigation of the charges, and all other facts essential to a broad understanding of the whole matter. *People v. Lavadie*, 2021 CO 42, ¶ 28. Other factors courts consider in determining whether a waiver was knowing and intelligent include whether the defendant understood the requirement of complying with procedural rules at trial, whether the court's exchange with the defendant consisted merely of pro forma answers to pro forma questions, and whether the defendant was trying to delay or manipulate the proceedings. *Arguello*, 772 P.2d at 94-95.

¶ 41     Whether a defendant effectively waived their right to counsel, and therefore can exercise their right to self-representation, is a mixed question of fact and law. *Lavadie*, ¶ 22. On appeal, we "accept the trial court's findings of historic fact if those findings are supported by competent evidence, but we assess the legal significance of the facts de novo." *People v. Coke*, 2020 CO 28, ¶ 10 (quoting *People v. Davis*, 2019 CO 24, ¶ 14).

## C.     Application

¶ 42     Henry doesn't challenge whether his waiver was voluntary; he only challenges whether it was knowing and intelligent.  We agree with the trial court's conclusion that it was.

¶ 43     Henry continuously engaged with the court during the *Arguello* advisement and at the later trial and sentencing, and he seemed to understand what was happening overall, despite a few moments when he expressed confusion.  And to the extent that some of his responses during the *Arguello* advisement may have bolstered his current claim, the trial court — which had the opportunity to observe his demeanor — expressed concern at one point that his responses were "trying to make it vague and stuff to try to create some error."

¶ 44     Also, while Henry said he had difficulty reading, there was no indication that this impacted the knowing and voluntary nature of his waiver because the court read the advisement in its entirety and provided an advisement form to Henry so he could follow along — and he indicated that he was able to do so.

¶ 45     Finally, the fact that the court didn't expressly consider any potential impact of Henry's TBI on the knowing or intelligent nature

of his waiver doesn't render it ineffective. Neither Henry nor his counsel referenced the TBI at any point during the *Arguello* advisement or asked the court to expressly consider it. Moreover, while the competency evaluation noted Henry's history of TBI, the evaluator's findings — such as that Henry didn't exhibit any significant confusion or difficulty understanding things, displayed an understanding of the nature of his charges and the consequences he might face if convicted, and didn't have a mental or developmental disability that prevented him from having a rational and factual understanding of the criminal proceedings — were consistent with the court's later conclusion that Henry's waiver of the right to counsel was knowing and intelligent.

## IV. Evidence of Suspected Bomb-Making Materials

¶ 46 Lastly, Henry contends that the trial court plainly erred by admitting evidence about suspected bomb-making materials found in the house in violation of CRE 401, 403, and 404(b). We disagree and conclude that any error in admitting the evidence wasn't plain.

### A. Additional Facts

¶ 47 While executing a search warrant of the home, officers found what they described as "suspected bomb-making materials." The

19

officers contacted the bomb squad to investigate the materials, which turned out to be substances that were legal to possess and, when combined, could not create an explosive device. Henry thus wasn't charged with any offenses relating to those substances.

¶ 48 Henry's theory of defense as to the drug charges was that the drugs had been planted in the house and that the police investigation wasn't sufficiently thorough. He specifically questioned why officers didn't run specific tests, search particular areas, or collect certain evidence.

¶ 49 The prosecution called the bomb squad supervisor to testify at trial about the investigation of the suspected bomb-making materials. The supervisor testified that the bomb squad was called to the house to "look at the chemicals and make sure that they were safe to be moved and make sure that they were not anything explosive." On cross-examination, he clarified that the bomb squad didn't find any actual explosives and that the substances found were legal to possess.

¶ 50 On redirect examination, the prosecutor elicited the following testimony from the bomb squad supervisor:

> [The substances] were three of four chemicals that were needed [to make a bomb]. So if there was one more chemical, which would be charcoal, you could make black powder, then confine that in something, and then it would become an improvised explosive device.
>
> But the individual precursors by themselves are legal to possess and not enough to consist of an improvised explosive device as we found them and what we found at the scene.

¶ 51    These materials were mentioned a handful of other times at trial, once by Henry himself, but Henry never lodged an objection.

### B.    Applicable Legal Principles

¶ 52    We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Abad*, 2021 COA 6, ¶ 8. A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair or if it misapplies the law. *Id.*

¶ 53    In the absence of a contemporary objection, we will reverse an error only if it amounts to plain error — in other words, if the error was "obvious, substantial, and 'so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.'" *People v. Snelling*, 2022 COA 116M, ¶ 33 (quoting *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011)).

¶ 54    As a general rule, evidence is admissible if it is relevant, CRE 402, meaning it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," CRE 401.  However, relevant evidence may still be excluded if the risk of unfair prejudice substantially outweighs its probative value. CRE 403.  Moreover, evidence of other crimes, wrongs, or acts isn't "admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."  CRE 404(b)(1).  To determine whether such evidence is admissible for other purposes, a court must apply the four-part test outlined in *People v. Spoto*, considering whether (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) that relevance is independent of the prohibited inference that the defendant has a bad character and acted in conformity with that character; and (4) the evidence's probative value isn't substantially outweighed by the risk of unfair prejudice.  795 P.2d 1314, 1318 (Colo. 1990).

## C. Application

¶ 55    We conclude that the trial court didn't err by admitting the testimony generally referencing the suspected bomb-making materials because that testimony was relevant to rebut Henry's assertion that the police investigation was inadequate.  Specifically, it was relevant to explain the officers' actions during the investigation of the house and why there was a pause in the police investigation while the bomb squad cleared the house.

¶ 56    However, we conclude that the trial court should not have allowed the bomb squad supervisor's testimony on redirect indicating that there was only one substance missing to create an explosive device.  That testimony had no logical relevance independent of the impermissible inference that Henry acted in conformity with a bad character trait.  Thus, admitting the testimony was not consistent with the law.  *See id.*; *Abad*, ¶ 8.

¶ 57    This error was not plain, however, for two reasons.

¶ 58    First, the references to suspected bomb-making materials were largely fleeting, and one of those references was made by Henry himself in his cross-examination of one of the officers.  The instance of the prosecution using the materials as impermissible character

23

evidence occurred only once in the course of a five-day trial. And the prosecutor didn't mention the materials in opening statements or closing arguments.

¶ 59    Second, the evidence supporting the convictions was overwhelming. As to the drug convictions, multiple officers testified that when Williams was questioned following the incident, she said she'd observed Henry sell drugs from the house earlier in the day. Moreover, the drugs underlying the charged offenses were found in a cooler in the house where Henry was staying. That same cooler also contained items often used in the distribution of drugs — such as a scale, small bags, and cash in different denominations — and multiple pieces of mail addressed to Henry. And an expert testified that the amount of drugs and the other items found with the drugs were indicative of narcotic sales.

¶ 60    As to the illegal discharge of a firearm conviction, officer testimony and bodycam video showed that officers found Henry with a rifle. Officer testimony and bodycam video also showed that when questioned at the scene, Henry admitted to shooting into the neighbor's house to prompt them to call 911. There was also evidence of bullet holes found in the neighbor's house.

¶ 61    Finally, as to the assault conviction, one of the officers testified that Williams reported that Henry choked her.  Photos taken that night show cuts and bruises on Williams's neck and arms.  And an officer testified that he observed these injuries, as well as petechiae in her eyes, and that they were consistent with being choked.

¶ 62    Accordingly, the error wasn't so substantial as to call into question the validity of Henry's convictions.

V.    Disposition

¶ 63    The judgment is affirmed.

JUDGE WELLING and JUDGE SULLIVAN concur.